# UNION PACIFIC RAILROAD CO. *v.* PRICE.

No. 414.   Argued March 31, 1959.—Decided June 29, 1959.

*James A. Wilcox* argued the cause for petitioner.   With him on the brief were *E. C. Renwick, Malcolm Davis, Calvin M. Cory* and *W. R. Rouse.*

*Samuel S. Lionel* argued the cause and filed a brief for respondent.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This is a diversity common-law action brought by the respondent, a former employee of petitioner railroad, in the United States District Court for the District of Nevada to recover damages from the railroad for allegedly wrongfully discharging him in violation of the collective bargaining agreement between it and the Brotherhood of Railroad Trainmen. The validity of the discharge was previously challenged upon the same grounds before the National Railroad Adjustment Board, First Division, in a proceeding brought by the Brotherhood on respondent's behalf under § 3 First (i) of the Railway Labor Act,[1] seeking the respondent's reinstatement with back pay. The Board rendered an award in favor of the petitioner. The question for decision here is whether the respondent may pursue a common-law remedy for damages for his allegedly wrongful dismissal after having chosen to pursue the statutory remedy which resulted in a determination by the National Adjustment Board that his dismissal was justified.

The respondent was employed by petitioner as a swing brakeman (an extra brakeman who is not a regularly assigned member of a train crew) and was a member of

---

[1] Section 3 First (i) of the Railway Labor Act, 48 Stat. 1191, 45 U. S. C. § 153 First (i), provides:

"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the inter-. pretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

the Brotherhood of Railroad Trainmen. The collective bargaining agreement between the Brotherhood and the petitioner contained two provisions involved in the dispute over his discharge. One provision, Article 32 (b), provided that: "Swing brakemen will not be tied up nor released at points where sleeping and eating accommodations are not available." The other provision, Article 33 (a), provided that: "When a trainman is suspended for an alleged fault, no punishment will be fixed without a thorough investigation, at which the accused may have a trainman of his choice present."

On July 12, 1949, the respondent was called to "deadhead" on Train No. 37 from Las Vegas, Nevada, to Nipton, California, at which point he was to detrain and await assignment to another train traveling to Las Vegas. Train No. 37 arrived at Nipton at 10:30 p. m., and the train dispatcher assigned respondent to train No. X 1622E, which was due to arrive at Nipton around 4 a. m., en route to Las Vegas. The respondent complained that there were no facilities available in Nipton for eating or sleeping and told the dispatcher he would go back to Las Vegas and return after getting something to eat. The dispatcher refused to release him and ordered him to wait the arrival of train X 1622E. The respondent disobeyed this instruction and deadheaded back to Las Vegas on a train which left Nipton at 11:10 p. m.

The railroad suspended the respondent on the morning of July 13. On July 16 he received a notice to appear at 10 a. m. on July 17 before an Assistant Superintendent of the railroad for an investigation. At the respondent's request the investigation was postponed to the morning of July 18, at which time the respondent requested a further postponement until his representative, the Brotherhood's Local Chairman, could be present. A postponement was again granted, until 2:30 p. m. of the 18th, but

the respondent's Local Chairman apparently was still not available at that time. When respondent failed to appear for the 2:30 hearing, the Assistant Superintendent proceeded with the investigation in his absence. The testimony of railroad witnesses was taken stenographically and transcribed; no evidence was received in respondent's behalf. On July 24 the railroad notified the respondent that he was discharged.

The Brotherhood processed respondent's grievance through the required management levels, and when settlement could not be reached, nor agreement arrived at for a joint submission to the National Railroad Adjustment Board, the Brotherhood, in January 1951, filed an *ex parte* submission with the Board's First Division.[2] Hearing was waived by the parties and the submission was considered on the papers filed by them. The Adjustment Board, on June 25, 1952, rendered its award "Claim denied," with supporting findings.[3]

---

[2] It is conceded that respondent authorized the Brotherhood to bring his claim before the Adjustment Board. Compare *Elgin, J. & E. R. Co.* v. *Burley*, 325 U. S. 711, aff'd on rehearing, 327 U. S. 661.

[3] The pertinent excerpts from the findings are the following:

"If the carrier is to have efficient operations on its railroad, employees must be relied on to obey operating instructions and orders. Claimant was found to have wilfully disobeyed his orders. This was insubordination and merited discipline.

"The employee . . . seeks complete vindication on the grounds that he was denied the investigation provided by the rules of agreement. Thus, the only question for review is whether there was substantial compliance with the investigation rule.

"Basically, the complaint is that the hearing was held when the claimant was not present.

". . . The right of the employee to be heard before being disciplined is a personal right which he can waive by action, inaction, or failure to act in good faith. . . .

". . . his position here would have been strengthened had he personally appeared at all stages of the proceeding to labor as best

Some three years after the filing of the award, the respondent, on June 6, 1955, brought the instant suit. His complaint alleges a cause of action predicated on the same grounds of allegedly wrongful dismissal in violation of the collective bargaining agreement which had been urged on the Adjustment Board, namely, (1) that he "was dismissed without cause" and (2) that he was dismissed without a "thorough investigation" because not "afforded an opportunity to have a trainman of his choice present at the investigation held" nor "afforded a reasonable opportunity to prepare his defense," "to present his defense," "to have witnesses present" or "to participate in his own defense." After filing an answer, the railroad moved for summary judgment on affidavits and other papers on file upon the ground that "any judicially enforceable cause of action arising from the termination of the employment relationship . . . is now barred by the adjudication and determination of the validity of such termination by the National Railroad Adjustment Board under the terms and conditions of said collective bargaining agreement, and pursuant to and in conformance with the Railway Labor Act . . . ." The District Court, without opinion, granted the motion and entered summary judgment in favor of the petitioner. The respondent appealed to the Court of Appeals for the Ninth Circuit, assigning as the single point on the appeal that the District Court "erred in holding that the award of the National Railroad Adjustment Board entitled . . . [the railroad] to Summary Judgment." The Court of Appeals, one judge dissenting, reversed, 255 F. 2d 663. Although the Court of Appeals held that the District Court would

---

he could to preserve his record and to get his story to us first hand. All that the transcript reflects does claimant no credit, but leaves us with the feeling that the things of which he now complains were planned by him that way."

be "without jurisdiction to entertain the action if the
Board award represents a determination on the merits,"
*id.,* at 666, the court concluded that while the question
whether the railroad was entitled to discharge the respond-
ent "was one of the two questions which Price submitted
for Board determination," "the Board made no determina-
tion on the merits" but determined only that in "the
manner in which the investigation was conducted by the
carrier . . . none of Price's rights in that regard was
abridged," and held that the District Court therefore had
jurisdiction to entertain the action. *Id.,* at 666-667.
We granted certiorari to decide the important question
raised by the case of the interpretation of the Railway
Labor Act. 358 U. S. 892.

We do not agree with the Court of Appeals' holding that
the Board's award was based solely on its decision that
Article 33 (a) was not violated by the railroad because
respondent's dismissal followed a "thorough investiga-
tion." Rather we think the award also reflects the Board's
determination that respondent was discharged for good
cause. Thus we agree with Judge Healy, dissenting
in the Court of Appeals, that on the face of the custom-
arily brief findings of the Board [4] it appears "plain that

[4] Garrison, The National Railroad Adjustment Board: A Unique
Administrative Agency, 46 Yale L. J. 567, 584, describes the awards
of the First Division of the National Adjustment Board as follows:

"It will be noted that, except for the purely jurisdictional recitals,
the findings consist of a single sentence ('The evidence indicates that
the movements made did not constitute switching under Article
I–R') which constitutes the nub of the whole decision. Rarely does
this central finding consist of more than a sentence or two. To a
lay reader the sentence quoted above is meaningless. In order that
it may be more intelligible the findings in their printed form are
preceded by the employees' statement of facts taken from their sub-
mission, and a statement of their position (likewise extracted from
the submission), followed by the management's statement of facts

the Board was of opinion, and in substance held, that the asserted violation by the Company of Article 32, even if true, would not serve to justify an employee's violation of direct operating instructions and his abandonment of his post." 255 F. 2d, at 667–668. Since the discharge could be set aside by the Board if either ground of the submission was sustained, the unqualified denial of the claim necessarily implied, we think, that the Board decided both grounds submitted adversely to the respondent. Even if the procedure followed by the railroad constituted a proper investigation, the Board's outright denial of the claim is explicable only on the ground that the Board also held that Article 32 (b) did not justify the respondent in disobeying the dispatcher's instruction to remain at Nipton. We conclude that both issues were decided by the Board against the respondent,[5] and therefore reach the question whether the respondent, despite the adverse determination of the Adjustment Board, could pursue the common-law remedy for damages in the District Court.[6]

---

and a statement of its position derived similarly from its submission. From these rival statements it is easy to determine what the controversy is about, but it is not easy to determine from the laconic findings the real basis upon which the decision was reached."

[5] In an interpretation announced on November 26, 1958, sought by the railroad under § 3 First (m) of the Railway Labor Act, the Board declared that its award reflected its conclusion that the railroad was justified in discharging respondent. This interpretation was not before the Court of Appeals in this case, and we refer to it only as further substantiation of our conclusion based on the record in the case.

[6] Since respondent, instead of bringing his claim in court as was his right under *Moore* v. *Illinois Central R. Co.*, 312 U. S. 630, chose to pursue that claim before the Adjustment Board, he does not even argue that a holding that the Railway Labor Act precludes a relitigation of that claim in the courts would deprive him of any constitutional right to a jury trial.

Congress has said in § 3 First (m) of the Railway
Labor Act[7] that the Adjustment Board's "awards shall
be final and binding upon both parties to the dispute,
except insofar as they shall contain a money award."
Respondent does not argue that a "money award" is any-
thing other than an award directing the payment of
money. Indeed, it would distort the English language
to interpret that term as including a refusal to award
a money payment. Thus, the plain language of § 3
First (m), on its face, imports that Congress intended
that the Board's disposition of a grievance should pre-
clude a subsequent court action by the losing party.
Furthermore, we have said of the Railway Labor Act
that "the specification of one remedy normally excludes
another." *Switchmen's Union* v. *National Mediation
Board,* 320 U. S. 297, 301. Thus, our duty to give effect
to the congressional purpose compels us to hold that the
instant common-law action is precluded unless the over-
all scheme established by the Railway Labor Act and the
legislative history clearly indicate a congressional inten-
tion contrary to that which the plain meaning of the words
imports. Our understanding of the statutory scheme and
the legislative history, however, reinforces what the statu-
tory language already makes clear, namely, that Congress
barred the employee's subsequent resort to the common-

---

[7] 48 Stat. 1191–1192, 45 U. S. C. § 153 First (m). That section
provides:

"The awards of the several divisions of the Adjustment Board
shall be stated in writing. A copy of the awards shall be furnished
to the respective parties to the controversy, and the awards shall be
final and binding upon both parties to the dispute, except insofar
as they shall contain a money award. In case a dispute arises involv-
ing an interpretation of the award the division of the Board upon
request of either party shall interpret the award in the light of the
dispute."

law remedy after an adverse determination of his grievance by the Adjustment Board.[8]

The purpose of the Railway Labor Act was to provide a framework for peaceful settlement of labor disputes between carriers and their employees to "insure to the public continuity and efficiency of interstate transportation service, and to protect the public from the injuries and losses consequent upon any impairment or interruption of interstate commerce through failures of managers and employees to settle peaceably their controversies." H. R. Rep. No. 328, 69th Cong., 1st Sess., p. 1. Congress did not, however, in the original 1926 Act, create the National Railroad Adjustment Board or make the use of such an agency compulsory upon the parties; rather the Act contemplated that settlement of disputes would be achieved through "machinery for amicable adjustment of labor disputes agreed upon by the parties . . . ." S. Rep. No. 606, 69th Cong., 1st Sess., p. 4. Congress, therefore, provided that adjustment boards should be "created by agreement between any carrier or group of carriers, or the carriers as a whole, or its or their employees." § 3 First of the Railway Labor Act of 1926, 44 Stat. 578. These adjustment boards, intended for use in settling what are termed minor disputes in the railroad industry, primarily grievances arising from the application of collective bargaining agreements to particular situations, see *Railroad*

---

[8] Despite the clear import of the statutory language and the legislative history the respondent argues that this Court's holding in *Moore* v. *Illinois R. Co.*, 312 U. S. 630, requires us to hold that the instant suit is not precluded. However, the holding in *Moore* was simply that a common-law remedy for damages might be pursued by a discharged employee who did not resort to the statutory remedy before the Board to challenge the validity of his dismissal. A different question arises here where the employee obtained a determination from the Board, and, having lost, is seeking to relitigate in the courts the same issue as to the validity of his discharge.

*Trainmen* v. *Chicago River & I. R. Co.*, 353 U. S. 30, were thus to be established by voluntary agreement. Congress, even in 1926 however, recognized that the boards would not be useful in bringing about industrial peace unless their decisions were binding on the parties. Thus the 1926 Act required that agreements creating adjustment boards must stipulate "that decisions of adjustment boards shall be final and binding on both parties to the dispute; and it shall be the duty of both to abide by such decisions . . . ." § 3 First (e) of the Railway Labor Act of 1926, 44 Stat. 579.

But the 1926 Act provided no sanctions to force the carriers and their employees to make agreements establishing adjustment boards and many railroads refused to participate on such boards or so limited their participation that the boards were ineffectual.[9]  Moreover, the boards which were created were composed of equal numbers of management and labor representatives and deadlocks over particular cases became commonplace. Since no procedure for breaking such deadlocks was provided, many disputes remained unsettled.  As reported to Congress in 1934 by Mr. Eastman, Federal Coordinator of Transportation: "Another difficulty with the present law [the 1926 Act], even where an adjustment board has been established, is that, although its decisions are final and binding upon both parties, there can be no certainty that there will be a decision."  Hearings before Senate Com-

---

[9] See Hearings before the Senate Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., p. 15. The Chairman of the United States Board of Mediation described § 3 First of the 1926 Act as follows: "The provision in the present [1926] act for adjustment boards is in practice about as near a fool provision as anything could possibly be.  I mean this—that on the face of it they shall, by agreement, do so and so. Well, you can do pretty nearly anything by agreement, but how can you get them to agree?" Hearings before the Senate Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., p. 137.

mittee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., p. 17. Strike threats became frequent in an atmosphere of mutual recriminations which presented the danger of creating the very strife which the statute had been designed to avoid. Mr. Eastman reported to the House Rules Committee: "[G]rievances on a number of roads have in the past few years accumulated to such an extent that the only remedy the men could see was to threaten a strike and thus secure appointment by the President of a fact finding board which could go into the whole situation. That has happened on several occasions. Some of these grievances have accumulated up into the hundreds on the various roads and when the situation finally became intolerable the men would threaten a strike . . . ." Hearings before the House Rules Committee, 73d Cong., 2d Sess., p. 25; see also p. 14; see also Hearings before the Senate Interstate Commerce Committee, 73d Cong., 2d Sess., p. 17; and see *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 725–726.

The railroad labor organizations were particularly dissatisfied. They urged that effective adjustment of grievances could be attained only by amendments to the 1926 Act that would establish a National Adjustment Board in which both carriers and employees would be required to participate, that would permit an employee to compel a carrier to submit a grievance to the Board, that would provide for a neutral person to break deadlocks occurring when the labor and management representatives divided equally, and, finally, that would make awards binding on the parties and enforceable in the courts, when favorable to the employees.[10] These views prevailed in the Con-

---

[10] Provision for judicial enforcement of awards against employees was thought to be unnecessary since grievances are usually asserted by employees challenging some action by the carrier, and if the grievance is not sustained by the Board, the award simply denies the claim and requires no affirmative action by the employee. If an

gress and resulted in the 1934 amendments which drastically changed the scheme of the Act. Act-of June 21, 1934, 48 Stat. 1185.[11] The National Railroad Adjustment Board was created and the carriers were required to participate through representatives selected by them, § 3 First (a) through (g). The Board is composed of four divisions each having jurisdiction over different employees and whose proceedings are independent of one another, § 3 First (h). Disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements must be handled in the usual manner up to and including the chief operating officers of the carrier designated to handle such disputes, but failing adjustment the disputes may be referred by the parties or by either party to the appropriate division, § 3 First (i). Upon failure of a division to agree upon an award because of a deadlock or inability to secure a majority vote of the division members, the division must appoint a neutral referee to sit with the division as a member thereof and make an award, § 3 First (1). Awards are final and binding except insofar as they contain a money award; in case of dispute involving an interpretation of the award either party may request the division to interpret the award in the light of the dispute, § 3 First (m). In case of an award favorable to the petitioner, the division shall make an order, directed to the carrier, to make the award effec-

unfavorable award results in a strike the carrier may obtain injunctive relief. *Railroad Trainmen* v. *Chicago River & I. R. Co.*, 353 U. S. 30; see also Hearings before House Committee on Interstate and Foreign Commerce on H. R. 7650, 73d Cong., 2d Sess., pp. 58–65.

[11] For discussion of the statutory scheme enacted in the Railway Labor Act and the 1934 amendments thereto, see *Elgin, J. & E. R. Co.* v. *Burley*, 325 U. S. 711; *Railroad Trainmen* v. *Chicago River & I. R. Co.*, 353 U. S. 30; *Washington Terminal Co.* v. *Boswell*, 75 U. S. App. D. C. 1, 124 F. 2d 235, aff'd by an equally divided Court, 319 U. S. 732.

tive and if the payment of money is required to pay such. sum to the employee, § 3 First (o). If the carrier does not comply with an order, enforcement may be sought by a suit in a District Court of the United States as provided in § 3 First (p).

The labor spokesman for the proposal made it crystal clear that an essential feature of the proposal was that Board awards on grievances submitted by or on behalf of employees were to be final and binding upon the affected employees. The employees were willing to give up their remedies outside of the statute provided that a workable and binding statutory scheme was established to settle grievances. Mr. George Harrison, President of the Brotherhood of Railroad Clerks, stated: "Grievances come about because the men file them themselves. Railroads don't institute grievances. Grievances are instituted against railroad officers' actions, and we are willing to take our chances with this national board because we believe, out of our experience, that the national board is the best and most efficient method of getting a determination of these many controversies . . . ." Hearings before the Senate Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., p. 33. "[W]e are now ready to concede that we can risk having our grievances·go to a board and get them determined . . . [but] if we are going to get a hodgepodge arrangement by law, rather than what is suggested by this bill, then we don't want to give up that right, because we only give up the right because we feel that we will get a measure of justice by this machinery that we suggest here." *Id.*, at 35. Mr. Eastman echoed this thought: "decisions of the adjustment board . . . are made final and binding by the terms of this act, and as I understand it, the labor organizations, none of them, are objecting to that provision. They have their day in court and they have their members on the adjustment board, and if an agreement cannot be reached between the parties

representing both sides on the adjustment board, a neutral man steps in and renders the decision, and they will be required to accept that decision when made . . . ." Hearings before House Committee on Interstate and Foreign Commerce on H. R. 7650, 73d Cong., 2d Sess., p. 59. See also *id.*, at 58–65.

Thus the employees considered that their interests would be best served by a workable statutory scheme providing for the final settlement of grievances by a tribunal composed of people experienced in the railroad industry. The employees' representatives made it clear that, if such a statutory scheme were provided, the employees would accept the awards as to disputes processed through the scheme as final settlements of those disputes which were not to be raised again.

Despite the conclusion compelled by the over-all scheme of the Railway Labor Act and its legislative history, it is suggested that because an enforcement proceeding against a noncomplying carrier under § 3 First (p) affords the defeated carrier some opportunity to relitigate the issues decided by the Adjustment Board,[12] unfairness results if

---

[12] Section 3 First (p) of the Railway Labor Act, 48 Stat. 1192, 45 U. S. C. § 153 First (p), provides:

"If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner . . . may file in the District Court of the United States . . . a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States. If the petitioner shall finally prevail he shall be allowed a reasonable attor-

§ 3 First (m) is construed so as to deny the employee the right to maintain this common-law action. We are referred to the emphasis upon the consideration of avoiding unfairness expressed in *United States* v. *Interstate Commerce Comm'n,* 337 U. S. 426, which held that a denial by the Interstate Commerce Commission of a claim of a shipper for money reparations is reviewable in the federal courts, pointing out that a Commission award favorable to a shipper was not final and binding upon the railroad. But that holding rested upon an interpretation of 28 U. S. C. (1946 ed.) § 41 (28) providing that "The district courts shall have original jurisdiction . . . Of cases brought to enjoin, set aside, annul, or suspend in whole or in part *any* order of the Interstate Commerce Commission." (Italics supplied.) In contrast, § 3 First (m) here involved commands that the Adjustment Board's "awards shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award." The Adjustment Board's award in controversy denied respondent's claim for reinstatement and back pay, which, we have said, was not a "money award." Although the provisions for enforcement of money awards in the Railway Labor Act, § 3 First (o) and (p), establish procedures similar to those under 49 U. S. C. § 16 (1) and (2) for enforcement of reparations orders of the Interstate Commerce Commission, § 3 First (m) with which we are here concerned has no counterpart in the Interstate Commerce Act. The disparity in judicial review of Adjustment Board orders, if it can be said to be unfair at all, was explicitly created

---

ney's fee, to be taxed and collected as a part of the costs of the suit. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board."

by Congress, and it is for Congress to say whether it ought be removed.

Plainly the statutory scheme as revised by the 1934 amendments was designed for effective and final decision of grievances which arise daily, principally as matters of the administration and application of the provisions of collective bargaining agreements. This grist of labor relations is such that the statutory scheme cannot realistically be squared with the contention that Congress did not purpose to foreclose litigation in the courts over grievances submitted to and disposed of by the Board, past the action under § 3 First (p) authorized against the noncomplying carrier, see *Washington Terminal Co.* v. *Boswell,* 75 U. S. App. D. C. 1, 124 F. 2d 235, aff'd by an equally divided Court, 319 U. S. 732, or the review sought of an award claimed to result from a denial of due process of law, see *Ellerd* v. *Southern Pacific R. Co.,* 241 F. 2d 541; *Barnett* v. *Pennsylvania-Reading Seashore Lines,* 245 F. 2d 579, 582. So far as appears, all of the Courts of Appeals [13] and District Courts [14] which have

---

[13] *Barnett* v. *Pennsylvania-Reading Seashore Lines,* 245 F. 2d 579 (C. A. 3d Cir.); *Bower* v. *Eastern Airlines, Inc.,* 214 F. 2d 623 (C. A. 3d Cir.); *Michel* v. *Louisville & N. R. Co.,* 188 F. 2d 224 (C. A. 5th Cir.); *Reynolds* v. *Denver & R. G. W. R. Co.,* 174 F. 2d 673 (C. A. 10th Cir.); *Washington Terminal Co.* v. *Boswell,* 75 U. S. App. D. C. 1, 10, 124 F. 2d 235, 244 (C. A. D. C. Cir.), aff'd by an equally divided Court, 319 U. S. 732.

[14] *Weaver* v. *Pennsylvania R. Co.,* 141 F. Supp. 214 (D. C. S. D. N. Y.), aff'd *per curiam,* 240 F. 2d 350 (C. A. 2d Cir.); *Byers* v. *Atchison, T. & S. F. R. Co.,* 129 F. Supp. 109 (D. C. S. D. Cal.); *Greenwood* v. *Atchison, T. & S. F. R. Co.,* 129 F. Supp. 105 (D. C. S. D. Cal.); *Farris* v. *Alaska Airlines, Inc.,* 113 F. Supp. 907 (D. C. W. D. Wash.); *Parker* v. *Illinois Central R. Co.,* 108 F. Supp. 186 (D. C. N. D. Ill.); *Futhey* v. *Atchison, T. & S. F. R. Co.,* 96 F. Supp. 864 (D. C. N. D. Ill.); *Kelly* v. *Nashville, C. & St. L. R. Co.,* 75 F. Supp. 737 (D. C. E. D. Tenn.); *Ramsey* v. *Chesapeake & O. R. Co.,* 75 Supp. 740 (D. C. N. D. Ohio); *Berryman* v. *Pullman Co.,* 48 F. Supp. 542 (D. C. W. D. Mo.).

dealt with this problem have reached the conclusion we reach here. To say that the discharged employee may litigate the validity of his discharge in a common-law action for damages after failing to sustain his grievance before the Board is to say that Congress planned that the Board should function only to render advisory opinions, and intended the Act's entire scheme for the settlement of grievances to be regarded "as wholly conciliatory in character, involving no element of legal effectiveness, with the consequence that the parties are entirely free to accept or ignore the Board's decision . . . [a contention] inconsistent with the Act's terms, purposes and legislative history." *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 720–721.

We therefore hold that the respondent's submission to the Board of his grievances as to the validity of his discharge precludes him from seeking damages in the instant common-law action.

The judgment of the Court of Appeals is reversed and the case is remanded with direction to affirm the judgment of the District Court.

*It is so ordered.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

The basic question in this case is the one reserved in *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 719, 720. It is whether an award that denies a claim for money damages comes within the exception of § 3 First (m) of the Railway Labor Act which provides that "the awards shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award."

It was pointed out in the dissent in that case (325 U. S., at 760–761) that the provision for finality of these awards

was close in origin to the reparation orders under the Interstate Commerce Act.

> "Since both Acts came out of the same Congressional Committees one finds, naturally enough, that the provisions for enforcement and review of the Adjustment Board's awards were based on those for reparation orders by the Interstate Commerce Commission. Compare Railway Labor Act, § 3, First (p) with Interstate Commerce Act, as amended by § 5 of the Hepburn Act, 34 Stat. 584, 590, 49 U. S. C. § 16 (1), (2). If a carrier fails to comply with a reparation order, as is true of non-compliance with an Adjustment Board award, the complainant may sue in court for enforcement; the Commission's order and findings and evidence then become *prima facie* evidence of the facts stated. But a denial of a money claim by the Interstate Commerce Commission bars the door to redress in the courts. *Baltimore & Ohio R. Co.* v. *Brady,* 288 U. S. 448; *I. C. C.* v. *United States,* 289 U. S. 385, 388; *Terminal Warehouse* v. *Pennsylvania R. Co.,* 297 U. S. 500, 507."

Since the decision in the *Burley* case the situation described in the dissenting opinion has changed. Subsequently, *United States* v. *Interstate Commerce Comm'n,* 337 U. S. 426, was decided; and it held, contrary to earlier precedents cited in the dissent in the *Burley* case, that orders in reparations cases which denied the claims of shippers were reviewable in the federal courts. It pointed out that the "negative order" doctrine, which we abandoned in *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, had greatly influenced those prior decisions.

We refused to follow that discarded doctrine there; and it should find no place here. An award of no damages is, as I see it, as much a "money award" as an award of 6 cents. The words "money award" are descriptive of the

nature of the claim, setting that class apart from other suits which involve, for example, a declaration of seniority rights.

Tolerance of judicial review has been more and more the rule as against the claim of administrative finality.[1] See *Shields* v. *Utah Idaho R. Co.*, 305 U. S. 177, 183; *Stark* v. *Wickard*, 321 U. S. 288, 309–310; *Harmon* v. *Brucker*, 355 U. S. 579, 581–582; *Leedom* v. *Kyne*, 358 U. S. 184, 190. The weight of the Administrative Procedure Act, 60 Stat. 243, 5 U. S. C. § 1009, is on the side of judicial review, the finality of administrative action being sanctioned only where it is clear from the statutory scheme that judicial review is precluded.

Respondent argues that it would be grossly unfair to construe § 3 First (m) so as to deny judicial review to a defeated employee but not to a defeated railroad. That would indeed be the result if an employee asserting a money claim cannot get court review if he loses, while the employer can obtain it if the employee wins. It is difficult for me to believe that Congress designed and approved such a lopsided, preferential system. No rhyme or reason is apparent for such discrimination. The attempt throughout was to equalize the advantages of the contending parties, not to prefer the employer who had long been dominant. *Washington Terminal Co.* v. *Boswell*, 75 U. S. App. D. C. 1, 6–7, 124 F. 2d 235, 240–241. Some have said that an award denying payment cannot be a "money award" in the intendment of the Act. *Berryman* v. *Pullman Co.*, 48 F. Supp. 542. But that is a narrow reading, not in keeping with the harmony of the Act. I would read § 3 First (m) so as not to preclude judicial

---

[1] Cases like *Switchmen's Union* v. *Mediation Board*, 320 U. S. 297, and *General Committee* v. *M-K-T R. Co.*, 320 U. S. 323, are no true exception, for those cases involved mediation, not adjudication—mediation being "the antithesis of justiciability." 320 U. S., at 337.

review in any suit for "money awards" no matter which party wins.

It is true that the Act does not provide the method of review in a case of this kind. Section 3 First (p) only covers the case where an award has been granted an employee and the carrier "does not comply." In that case the order of the Board "shall be prima facie evidence of the facts therein stated." § 3 First (p). But this action is properly maintainable if the District Court otherwise has jurisdiction. No question of election of remedies is involved because of the express provision in the Act that the award of the Board is not final. Since there is no provision in the Act that specifies what judicial review may be obtained, there are preserved whatever judicial remedies are available. One of those is a suit for damages for wrongful discharge. In three separate decisions we have said that actions for wrongful discharge can be maintained in the courts by the employee. *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630; *Slocum* v. *Delaware, L. & W. R. Co.,* 339 U. S. 239, 244; *Transcontinental Air* v. *Koppal,* 345 U. S. 653, 661. We stated in the *Slocum* case that "A common-law or statutory action for wrongful discharge differs from any remedy which the Board has power to provide . . . ." The Board has power to reinstate the discharged employee and award back pay; and that was the relief which this employee sought before the Board. But the common-law action for wrongful discharge may include other items of damages as well. Here the employee claimed not only lost earnings but future earnings, seniority rights, retirement rights, hospitalization rights, and transportation rights. Whether Nevada law that governs this contract would grant as much is not now important. The point is that the measure of the recovery in a suit for damages is not necessarily the same and may in fact be greater, including an

award of attorney fees.[2]   It is difficult to believe that this cause of action triable before a jury is lost, wiped out, or abolished merely because the employee loses out when he pursues the lesser or more restrictive remedy before the Board.   If there is to be equality between employer and employee in the assertion of rights and the assumption of duties under the Act, the employee cannot be held to have merely one chance if he proceeds before the Board, while the employer has a remedy first before the Board and, if he loses there, another one before the court.

In my view the Court's contrary reading of § 3 raises questions of constitutional magnitude.   For if an employee is to be denied any review of the Board's decision when the railroad prevails, while the latter can obtain judicial review with a jury trial before complying with a Board order, there would appear to be an unjustifiable discrimination in violation of the Due Process Clause of the Fifth Amendment.   It is not the usual practice in this country to permit one party to a lawsuit two chances to prevail, while the other has only one, nor to permit one party but not the other to get a jury determination of his case.   See *Pennsylvania R. Co.* v. *Day, ante,* p. 554 (dissent).

The result is that I would remand the case to the District Court for trial.

---

[2] See, *e. g.,* Wis. Stat. Ann., § 103.39 (3) ; Tex. Civ. Stat., Art. 2226. Cf. Fair Labor Standards Act, § 16 (b) ; 29 U. S. C. § 216 (b).