Silas W. ELLERD, Plaintiff,

v.

SOUTHERN PACIFIC R. CO. et al., Defendants.

No. 56 C 30.

United States District Court
N. D. Illinois, E. D.
Feb. 28, 1961.

---

8. The proof of loss was submitted on February 6, 1960.

Robert Tieken, U. S. Atty., Chicago, Ill., for National Railroad Adjustment Bd.

Burke Williamson, Adams Williamson & Turney, Chicago, Ill., and Harold C. Heiss, Russell B. Day, Heiss, Day & Bennett, Cleveland, Ohio, for Brotherhood.

Melvin B. Lewis, Asso. Counsel, Arthur J. O'Donnell and James J. Doherty, Chicago, Ill., for Ellerd.

Alvin V. Nygren, Allen D. Holloway, John N. Kern, Chicago, Ill., Burton Mason, Oakland, Cal., W. A. Gregory, W. R. Denton, San Francisco, Cal., for Southern Pacific.

ROBSON, District Judge.

This cause was remanded for further proceedings consistent with the opinion of the Court of Appeals (Ellerd v. Southern Pacific Railroad Co., 7th Cir., 1957, 241 F.2d 541), which was decided on an appeal by plaintiff from a summary judgment for the defendant Southern Pacific Railroad Co., hereinafter referred to as the Railroad, to review and set aside an award of the First Division of the National Railroad Adjustment Board, hereinafter referred to as the Board.

In the decision of the Court of Appeals, it is stated at page 545:

" * * * [T]he crucial issue is whether plaintiff had authorized the brotherhood in any legally sufficient manner to represent him individually in the board's proceeding. *Had the record here disclosed without controversy that the union had authority to represent plaintiff and did actually represent him in good faith,* *there would be no question of the propriety of the board's order and the court would have been fully justified in entering judgment for defendants.* But, in view of the dispute, the court had no right to enter any judgment until that decisive issue had been determined.

" * * * The question here presented of whether plaintiff had received due process of law was not before the court. Hence, that issue has not been adjudicated. It has been presented to the trial court in this case and can be decided only upon hearing evidence. In this situation, we can conceive of no recourse except to reverse the judgment, so that the court may determine the essential question of whether plaintiff has been deprived of a constitutional hearing in such manner as to lodge in the district court jurisdiction to review the order of the board." (Emphasis ours.)

The Court of Appeals had theretofore stated at page 544:

" * * * [T]here is injected into this case a serious question as to the validity of the proceeding before the board. As we have observed, plaintiff avers that the union had no right to represent him in presenting the claim purported to be made in his behalf, and that he had no personal notice of such proceedings and is not bound thereby. The union, on the other hand, asserts that it had full authority to represent plaintiff; that it did represent him in good faith, and that the proceedings before the board were regular and valid. Thus there is a contested question upon the only issue affirmative decision upon which would give the court the right to review the proceeding before the board."

After remandment, a pre-trial conference was held which resulted in a pre-trial order composed of a stipulation of facts and a statement of the respective contentions of the parties and of the issues of law here involved.

A full trial was then had at which both plaintiff and David Carr, the Local Chairman of the Brotherhood of Locomotive Firemen and Enginemen, hereinafter referred to as the Brotherhood, who handled plaintiff's claim initially, and others, testified.

On the basis of that testimony and the stipulation of facts, the Court resolves the critical factual issue against the plaintiff. It finds that plaintiff authorized the Brotherhood to represent him in the presentation of his claim to the Railroad, and before the Board.

The stipulation discloses that at all times material to this action an "applicable" agreement existed between the Brotherhood (of which plaintiff had been a member since employment by the Railroad in 1943) and the Railroad. Plaintiff's name was placed on the seniority roster of firemen of the Tucson Division on February 21, 1943, and was not included on said roster prepared on or about January 3, 1950, nor has it appeared thereon since that time.

Plaintiff was injured on January 7, 1949. The next month he brought a Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., action in a California state court, claiming permanent injuries. On July 14, 1949, he petitioned to have the trial advanced, declaring *inter alia*, that he had been informed that there was no chance he would ever be able to return to railroad work. In November, 1949, a $70,000 verdict was returned in his favor against the Railroad, which

verdict he settled for $65,000 on December 12, 1949, executing a written release.[1]

The stipulation further reveals that plaintiff was advised by David Carr that his name had been omitted from the roster. Acting in his capacity as such Local Chairman of the Brotherhood, Carr, on or about February 11, 1950, transmitted a letter to the superintendent of the Railroad's Tucson Division, asserting that by removing plaintiff's name from the seniority roster the Railroad had discharged plaintiff from its employment, and that said discharge was unlawful and in violation of the applicable agreement, and demanded that his name be restored to said seniority roster. The demand was declined in writing by the superintendent. Carr, in collaboration with C. W. Moffitt,[2] the General Chairman of the Brotherhood, appealed the claim and demand on behalf of the plaintiff to the Railroad's General Manager. After a conference between Moffitt, acting as said General Chairman, and the representative of the Railroad's General Manager, the claim of plaintiff was again declined by the Railroad.

Thereafter, Moffitt filed with the Board a claim and demand for restoration of plaintiff to the roster. The claim contended that plaintiff had been removed and discharged without notice, hearing or representation, all in violation of the applicable collective bargaining agreement and particularly in violation of Article 51 of said agreement.

1. The release read, in part: "Received of Southern Pacific Company the sum of * * * $65,000.00 in full satisfaction of judgment for $70,000.00 * * * in favor of plaintiff and against defendant, in that certain action * * * pending in the Superior Court of the State of California, * * * brought to recover $250,000.00 for personal injuries suffered on or about January 7, 1949, at Phoenix, Arizona, in collision between two Southern Pacific Company engines, on one of which I was working during the course of my employment with Southern Pacific Company as a fireman, alleged due to the negligence of Southern Pacific Company and its employees in the operation

of said engines, and it is hereby authorized and directed that full satisfaction of said judgment * * * be entered of record in said action. * * *"

2. A letter dated March 2, 1950, from plaintiff's personal injury attorney Ryan tells of plaintiff's letter dated February 28, 1950, to him, and the attorney's getting in touch with Moffitt, who in turn advised the attorney he had already been contacted. The attorney counseled plaintiff to press his claim through the Brotherhood, and Carr testified that this March 2, 1950, letter was turned over to him by Ellerd and passed on to Moffitt before March 21, 1950.

The Railroad also filed a "submission" with the Board, claiming that plaintiff had voluntarily relinquished his seniority rights by claiming permanent and total disability in the prior personal injury suit, and that since there was a voluntary retirement no agreement provision was involved and no hearing required such as where discipline is to be imposed. Thereafter, following due handling of the demand by the Board, including an opportunity to both the Brotherhood and the Railroad to be heard, the Board entered an Award on June 27, 1952, deciding that plaintiff was not entitled under the applicable agreement to be retained on the roster and denied his claim to be restored. (Inferentially, it might be stated that the Brotherhood must have presented a plausible case because the members of the Board divided, and a referee had to be named to resolve the conflict.)

The "applicable agreement" provided that a written claim must be filed within 90 days of the occurrence upon which it is based, and except for the one filed with the Railroad by Carr on February 11, 1950, *none* was ever filed for plaintiff for unlawful dismissal by reason of the omission of his name from the roster.

The Constitution of the Brotherhood is stipulated to have two provisions, *"both well known"* to the plaintiff. Section 16(a) provides for action by the aggrieved party in initiating action with the local Lodge for the presentation and adjustment of his grievance. Section 16 (b) provides:

> *"Every member by becoming such shall be deemed to have authorized the Brotherhood and its duly consti-*
> *tuted committees and officers to act as his agent or representative in the handling of all claims, grievances, complaints, and disputes which have arisen or may arise* under an agreement negotiated with a railroad or other employer, and pursuant to such authorization in their discretion to present, settle, adjust or compromise the same in conference, or in or before any court or other tribunal, or by other procedures *including those provided by the Railway Labor Act, and to have waived throughout all right to notice and appearance provided by statute or otherwise, unless a member in individual cases, gives to the Brotherhood seasonable written notice to the contrary."* (Emphasis ours.)

It is stipulated *plaintiff gave no such notice to the Brotherhood that he desired that the Brotherhood not act as his agent* or representative in the handling of the claim culminating in the Award No. 15543.

The Court is clearly convinced that despite the sharp contradiction in the testimony, the truth lies with the testimony of the Brotherhood's representative. There is no question whatsoever that plaintiff actually knew and authorized the Brotherhood's handling of his claim against the Railroad. The straightforward demeanor and candor of the witnesses for the defendants, as contrasted with the plaintiff's evasiveness and artfulness, support the somewhat meager documentary evidence that plaintiff was fully aware, at all times, of Carr's and the Brotherhood's actions in his behalf.[3]

---

3. Plaintiff testified that Carr phoned him in January or February, 1950, advising him that plaintiff's name had been removed from the roster. He stated he had gone to Carr's home, and Carr, to his home. Carr had handled another demerits claim for plaintiff and plaintiff knew how these claims were handled. He admits seeing Carr after a "trip pass" which plaintiff had requested for his wife in January, 1950, had been denied. When, on March 21, 1950, Carr wrote Moffitt, General Chairman of the Brotherhood, forwarding plaintiff's file, Carr stated therein that he had talked to Ellerd, and that Ryan, plaintiff's attorney, had talked to Moffitt, which meant that Carr was "handing over the case to the general chairman because [he] had not been able to effect the restoration of Ellerd's name." Along with the file, Carr enclosed a letter dated March 2, 1950, from Ryan to Ellerd, from whom he had received the letter.

Carr testified specifically that

" * * * [D]uring the course of my handling of this case I had many opportunities to go to Mr. Ellerd's house, to talk to him on the telephone, and for Mr. Ellerd to come to my home. The exact number of times is rather vague in my memory, but I do know that at any time that I wrote any correspondence or received any *correspondence in connection with this case, Mr. Ellerd was apprised of them,* the contents of them, and *we discussed the contents of them.* * * * " (Emphasis ours.)

At another point, Carr testified that he discussed with Ellerd the fact that Ellerd's name might be removed from the seniority roster and that in his opinion the company was violating their agreement. He stated that:

"Mr. Ellerd replied—well, I can't say his exact words, but he agreed with me and we talked about it and he said in as many words that he was for it, *he wanted me to handle it.* * * * *He was for my handling of the case.*" (Emphasis ours.)

Carr also testified that he showed Ellerd the letter he had written to the superintendent.

At another point, Carr was asked whether he had not previously testified that he gave copies of all correspondence pertaining to the case of restoration of Mr. Ellerd, to him, and he said that was right, and that he gave him the letters probably within a couple of days after he had written them. Carr also stated "absolutely" that he had notified Ellerd of the final denial to restore his name to the roster. At another point, Carr stated that Ellerd got a copy of every single piece of correspondence between Carr

and Moffitt, and between Moffitt and Hughes (Assistant General Manager of the Railroad). Carr stated that altogether during the time between January of 1950 and the time the case went to the Board he went to Ellerd's house ten or a dozen times for the "entire thing." Carr also stated that under the agreement the employee had to protest removal of his name within a limited time of the removal or he would lose his right to restoration, and since Carr did not know the precise date of removal he went ahead and acted to save Ellerd's rights. The applicable agreement provided that any claim or grievance had to be filed with the Railroad within ninety days and none was filed except the one by Carr. Furthermore, plaintiff gave no notice to Carr that he did not desire the Brotherhood to act for him as required by Section 16(b) of the Constitution.

As above stated, the Court is so thoroughly impressed with the veracity of Carr's testimony as contrasted with the speciousness and untenability of Ellerd's that it has no difficulty in resolving the fact issue of whether or not Ellerd had knowledge of, and approved, Carr's and the Brotherhood's handling of his alleged grievance in favor of defendants. There was, in fact, an authorization by Ellerd of the Brotherhood to handle his claim.

Not only is there the actual factual authorization, but there was the implied legal authorization because the parties have stipulated that the provisions of the Constitution were "well known" to Ellerd and Sections 16(a) and (b) thereof provide that the member may initiate action with the local lodge, and more importantly, by becoming a member he *"shall be deemed to have authorized the Brotherhood * * * as his agent in the handling * * * of all claims"* and will be deemed *"to have waived * * * right to notice and appearance"* unless

Carr's statement that when he received correspondence in respect to a member from the higher officials in the Brotherhood he received two copies, one of which he gave to the member involved and the other he kept in the local lodge's file, is corroborated by the notation at the end

of Moffitt's April 5, 1950, letter, which bears the notation that Carr was to receive two copies. It was also corroborated by Mrs. Carr's testimony that when she typed letters for her husband she, too, made an extra copy for the member involved.

he gives the Brotherhood seasonable notice to the contrary. Again it is stipulated no such notice was given. Such a holding is sustained by a statement in a footnote to the original opinion in Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 738, 65 S.Ct. 1282, 1297, 89 L.Ed. 1886, where it was said:

> "Authority might be conferred in whatever ways would be sufficient according to generally accepted or 'common law' rules for the creation of an agency, as conceivably by specific authorization given orally or in writing to settle such grievance, by general authority given to settle such grievances as might arise, or *by assenting to such authority by becoming a member of a union and thereby accepting a provision in its constitution or rules* authorizing it to make such settlements." (Emphasis ours.)

Having determined that Ellerd actually knew and authorized the Brotherhood's representation of him, the statement of the Supreme Court in Elgin, Joliet & Eastern Railway Co. v. Burley, 1946, 327 U.S. 661, 666, 66 S.Ct. 721, 723, 90 L.Ed. 928, becomes extremely pertinent:

> "* * * [W]e did not rule, and there is no basis for assuming we did, *that an employee can stand by with knowledge or notice of what is going on with reference to his claim, either between the carrier and the union on the property, or before the Board on their submission, allow matters to be thrashed out to a conclusion by one method or the other, and then come in for the first time to assert his individual rights.*" (Emphasis ours.)

The Court in that same case also pointedly remarked at page 665, 66 S.Ct. at page 723:

> "*It is not likely that workingmen having grievances will be ignorant* in many cases either *of negotiations* conducted between the collective agent and the carrier for their settlement *or of the fact that the dispute has been submitted by one or*

*the other to the Adjustment Board for determination.*" (Emphasis ours.)

There is the further matter of the effect of plaintiff's Federal Employers' Liability Act suit in California, wherein a settlement was effected. It is plaintiff's contention that an oral understanding was had at that time that the settlement would have no effect on his returning to work for the Railroad in the future should he find himself capable of doing so. Accepting at face value the affidavit of plaintiff's counsel who represented him in that suit, the situation would seem to be that the Railroad's attorney in the personal injury suit advised plaintiff's attorney:

> "* * * that he never heard of the Southern Pacific Company firing a man because he brought suit and recovered judgment against the company. He stated that he did not think Mr. Ellerd would ever be able to return to railroad work, but that if by some chance he should be able to do so that he would have his job back. He said he believed that matter was covered by contract between Ellerd's brotherhood and the Southern Pacific Company."

This hardly seems like a contractual statement; rather it sounds like a gratuitous opinion. No reference is made thereto in the written release.

■ Be that as it may, the more important fact is that plaintiff in the California Federal Employers' Liability Act suit sought $250,000 damages for injuries which he alleged he was informed and believed were permanent, and that he would "never again be able to follow said occupation, or any other occupation requiring physical effort." His affidavit in support of his motion to advance stated that his "right knee would never be of any value," and there was no chance he would "ever be able to return to railroad work." It is stated that at the Federal Employers' Liability Act trial, actuarial evidence was adduced to prove the loss of future earnings.

In the face of these facts, the applicable rule of law is firmly established that one who recovers a verdict based on future earnings, the claim to which arises because of permanent injuries, estops himself thereafter from claiming the right to future re-employment. Scarano v. Central R. Co. of N. J., 3 Cir., 1953, 203 F.2d 510, affirming D.C.Pa.1952, 107 F.Supp. 622; Wallace v. Southern Pac. Co., D.C.Cal.1951, 106 F.Supp. 742; Buberl v. Southern Pac. Co., D.C.Cal.1950, 94 F.Supp. 11.

The Scarano case was a suit for breach of a collective bargaining agreement by a railroad for failure to reinstate an employee who had theretofore recovered a judgment in a suit predicated on permanent loss of earning capacity. The Court of Appeals for the Third Circuit affirmed the dismissal of the suit on a motion for summary judgment, holding that it was proper for the District Court to refuse to allow plaintiff to litigate a claim in contradiction of his earlier position. In the Buberl case, the Court held it "unconscionable" for one who had already received an award for protracted loss of opportunity to work to attempt to do so again.

In appraising the tenability of plaintiff's position, the holding of the Supreme Court in Union Pacific Railroad Co. v. Price, 1959, 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460, is significant. In that case, a railroad employee claimed that he had been discharged in violation of the collective bargaining agreement, and his union, acting on his behalf and with his consent, submitted the grievance to the Board, which found that his dismissal was justified. Thereafter the employee sued the Railroad in the District Court to recover damages for wrongful discharge. It was held that his submission of his grievances, as to the validity of his dismissal, to the Board precluded him from seeking damages for that dismissal in a common law action. The Court said, at pages 608–609, 79 S.Ct. at page 1355 that the "plain language of [the act] * * * imports that Congress intended that the Board's disposi-

tion of a grievance should preclude a subsequent court action by the losing party. * * * Congress barred the employee's subsequent resort to the common-law remedy after an adverse determination of his grievance by the Adjustment Board."

It is further contended that the Act (Section 3(m) of the Railway Labor Act, 45 U.S.C.A. § 153(m)) is unconstitutional as violative of the Fifth Amendment of the Constitution in that judicial review of an award of the Board is provided only where the Award is adverse to the carrier, and not where it is adverse to the employee. The constitutionality of the Act has been intimated in Pennsylvania Railroad Co. v. Day, 1959, 360 U.S. 548, 79 S.Ct. 1322, 3 L.Ed.2d 1422, and Union Pacific Railroad Co. v. Price, 1959, 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460. A similar holding is Denver & Rio Grande Western Railroad Co. v. Brotherhood of Railroad Trainmen, D.C.Colo.1960, 185 F.Supp. 369. However, the well-established rule counsels avoidance of determination of constitutionality of statutes, absent compelling necessity for such determination. Thus it has been said:

"* * * [N]o matter how much they may favor the settlement of an important question of constitutional law, broad considerations of the appropriate exercise of judicial power prevent such determinations unless actually compelled by the litigation before the Court. * * * Likewise, 'Courts should avoid passing on questions of public law even short of constitutionality that are not immediately pressing. Many of the same reasons are present which impel them to abstain from adjudicating constitutional claims against a statute before it effectively and presently impinges on such claims.'" Barr v. Matteo, 1957, 355 U.S. 171, 172, 78 S.Ct. 204, 205, 2 L.Ed.2d 179.

In view of the determination of the other issues in this cause, it is unnecessary to

pass upon the constitutional phase of the plaintiff's contentions.

Inasmuch as the Court "determines the issue of fact as to due process against plaintiff" it has "no right to review the board's order." Ellerd v. Southern Pacific Railroad Co., 7 Cir., 241 F.2d 541, 545. And as the Court of Appeals said, "Had the record here disclosed without controversy that the union had authority to represent plaintiff and did actually represent him in good faith, there would be no question of the propriety of the board's order and the court would have been fully justified in entering judgment for defendants."

The Court directs that the defendants submit simplified, consolidated findings of fact and conclusions of law, incorporating the stipulation of facts, consonant with this opinion. They shall also prepare a draft judgment order consistent therewith.