**Eugene HORTON, Jr., Plaintiff,**

v.

**NORFOLK SOUTHERN CORPORATION, Defendant.**

**No. 1:97CV01247.**

United States District Court, M.D. North Carolina.

March 8, 1999.

Romallus O. Murphy, Greensboro, NC, for Eugene Horton, Jr., plaintiff.

M. Daniel McGinn, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, for Norfolk Southern Railway Company, defendant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This matter is before the court on Defendant Norfolk Southern Corporation's ("Norfolk Southern") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This action arises out of Plaintiff Eugene Horton, Jr.'s claim that he is entitled to a $70,000.00 payment pursuant to a letter agreement which modified the terms of the collective bargaining agreement governing the terms of Horton's employment with the Norfolk Southern Railway Company ("NSRC").[1] Alleging that he was denied this payment because of his race, Horton's complaint asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981 ("Section 1981"), and the Thirteenth Amendment to the United States Constitution. For the following reasons, the court will grant Norfolk Southern's motion as to all of Horton's claims.

---

1. Norfolk Southern notes that Horton was employed by NSRC and not Norfolk Southern. Thus Norfolk Southern contends that this action should be dismissed against it. Horton has not responded on this point. While Norfolk Southern should be dismissed if NSRC was Horton's employer, the court believes that NSRC should be substituted as defendant. Accordingly, the court will order the parties to show cause, if any, why this court should not dismiss Norfolk Southern and substitute NSRC as defendant.

## FACTS

The following facts are established in the pleadings, affidavits, deposition testimony, and exhibits offered by the parties. Where there are disputes, each party's position is given.

Horton began working for the former Carolina and Northwestern Railway Company ("C & NW") on the Lenoir District on July 22, 1972. In 1973, pursuant to an implementing agreement, C & NW was coordinated with the Southern Railway Company, predecessor to NSRC. At that time employees in Horton's position had two options. First, they could elect to stay on the former C & NW line and work only to fill temporary vacancies on the former C & NW line. Alternatively, they could "mark up" for the extra board in NSRC's Asheville District. An employee choosing the first option was on "furlough" status, whereas an employee choosing the second option was on "active" status. If an employee chose the first option, he could elect to switch to the second option at any time. However, once an employee chose the second option, that decision was permanent.

Horton elected the first option and therefore was on furlough status. Horton never elected the second option and never became an active employee. Over the years, Horton worked occasionally for NSRC. From 1983 until 1993, Horton earned only $900.00 in wages from NSRC. Until 1993, Horton supported himself by farming and by working twenty to thirty hours per week at the United States Post Office.

On May 27, 1993, NSRC announced a voluntary separation program for certain employees in the Asheville district. Under the program, an eligible employee who agreed to resign and execute a release of claims against NSRC received a check in the amount of $110,000.00. The deadline for participation in this program was June 11, 1993. On July 1, 1993, approximately three weeks after the deadline, Horton executed an application to participate in the voluntary separation program. Although Horton was not an active employee and his application was approximately three weeks late, NSRC accepted his application.

On July 22, 1993, D.G. Rush wrote to Horton to inform him that NSRC had accepted his application. Enclosed with this letter was a copy of a resignation and release. On August 2, 1993, Horton visited train master H.L. Sherlin, Jr.'s office. Sherlin told Horton that signing the resignation and release severed all ties and rights Horton had with NSRC. Horton signed the resignation and release and Sherlin gave Horton a check for $110,000.00.

Meanwhile, on May 31, 1993, NSRC and the United Transportation Union ("the Union") entered into a letter agreement which related to the distribution of the proceeds of Productivity Fund No. 56, Carolina Division, to eligible employees. The letter agreement was a modification of the collective bargaining agreement entered into between NSRC and the Union on June 30, 1984 ("the CBA"). The Productivity Fund represented the proceeds of liabilities NSRC accrued under agreement with the Union by running reduced crews. The Fund was designed to allow eligible employees to share in the savings realized by NSRC as a result of running reduced crews. Under the terms of the letter agreement, eligible employees could elect to receive either $40,000.00 in July 1993 and $20,000.00 at retirement, death, or resignation, or $30,000.00 in July 1993 and $40,000.00 at retirement, death, or resignation (these payments will be referred to as "Productivity Fund Buyout"). Under the terms of the letter agreement, eligible employees were defined as conductors and trainmen (foremen/yardmen) in active service as such on May 18, 1993, who have a seniority date in train service prior to September 1, 1984. An employee would be deemed active if he returned to service after May 18, 1993, from illness, furlough, injury, suspension or dismissal.

NSRC distributed the information about the Productivity Fund Buyout to potentially eligible employees. On June 14, 1993, Horton completed a payment election form for the Productivity Fund Buyout indicating that he wished to receive $30,000.00 in July 1993 and $40,000.00 at death, retirement, or resignation. NSRC, however, determined that Horton was not eligible to receive the Productivity Fund Buyout because he was not in active service within the meaning of the letter agreement. Horton did not become aware of this fact until after he had executed the resignation and release in connection with the voluntary separation program on August 2, 1993.

On October 13, 1993, R.D. Wallace, a union local chairperson, wrote to NSRC on behalf of Horton inquiring as to the reason that he had not received the Productivity Fund Buyout. Eugene Green, superintendent of NSRC's Piedmont Division, investigated and determined that Horton was ineligible because he was not an active employee.

On January 6, 1994, the union appealed Superintendent Greens's decision to D.R. Ray, the director of labor relations for NSRC. Ray concurred with Green's decision. The issue was then appealed to a public law board. Both the NSRC and the Union on behalf of Horton submitted briefs to the public law board regarding whether Horton was eligible for the Productivity Fund Buyout. The Union contended that Horton was in active service because he had worked for NSRC on April 12, 13, May 3, 4, 21, and 22, 1993. NSRC contended that Horton was on furloughed status, that his occasional protection of vacancies did not make him an active employee, but that he could have elected at any time to become an active employee by marking up on the Asheville Extra Board. As previously noted, however, Horton had never exercised this option.

On May 22, 1994, the public law board arbitrator ruled that Horton was not eligible for the Productivity Fund Buyout under the terms of the letter agreement and that Horton had released all claims against NSRC. Specifically, the arbitrator ruled that "claimant Horton is not qualified to receive payment. He was not in active train service on May 18, 1993, and never returned to active service prior to signing a resignation and release in exchange for the sum of $110,000.00 from [NSRC]." (Horton Dep. Ex. 16; O'Brien Decl. ¶ 24.)

In addition to pursuing his grievance with the union, Horton also filed a charge of discrimination with the EEOC on October 8, 1993. The EEOC issued a right-to-sue letter on September 9, 1997, and Horton filed this action on December 5, 1997.

## DISCUSSION

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment motion can simply argue the absence of evidence by which the non-movant can prove her case), *cert. denied*, 513 U.S. 1191, 115 S.Ct. 1254, 131 L.Ed.2d 135 (1995). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the [fact-finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

Initially, the court notes that Horton has conceded his claim under Section 1981. (*See* Pl.'s Br. at 12.) In addition, Horton's claim under the Thirteenth Amendment must fail because the Thirteenth Amendment does not give rise to an independent action for employment discrimination. *See Baker v. McDonald's Corp.,* 686 F.Supp. 1474, 1480 n. 12 (S.D.Fla.1987), *aff'd,* 865 F.2d 1272 (11th Cir.1988); *Westray v. Porthole, Inc.,* 586 F.Supp. 834, 839 (D.Md.1984). Accordingly, the court will grant Norfolk Southern's motion for summary judgment as to Horton's claim under Section 1981 and the Thirteenth Amendment.

A. *Whether Horton's Title VII Claim is Pre-emoted by the RLA*

As for Horton's remaining claim under Title VII, Norfolk Southern first contends that this court lacks subject matter jurisdiction because his claim is "pre-empted" by the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* Pre-emption doctrine is grounded in the Supremacy Clause of the Constitution and relates to the primacy of federal law over state law. *See, e.g., Felt v. Atchison, Topeka & Santa Fe Ry. Co.,* 60 F.3d 1416 (9th Cir.1995); *cf. Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 208, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (discussing congressional power to pre-empt state law). In this case, however, the court is presented with the relationship between two federal statutes. Thus, pre-emption doctrine, at least insofar as it is traditionally understood, does not apply. *See Felt,* 60 F.3d at 1418–19. Instead, the issue is whether the RLA's mandatory arbitral mechanism deprives an employee of his right to bring an independent action under Title VII in circumstances where, in analyzing an essential element of a plaintiff's *prima facie* case, a federal court would need to interpret a letter agreement modification to a CBA. *See Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 559–62, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (rejecting contention that RLA prevented employee from bringing an action under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 52–60). While pre-emption doctrine does not strictly apply, "[t]he inquiry is similar to pre-emption analysis ... because both pre-emption of state law and preclusion of federal statutory remedies are questions of congressional intent." *Felt,* 60 F.3d at 1419.

In enacting the RLA, Congress sought to stabilize labor-management relations in the railroad industry by providing a comprehensive framework for the resolution of labor disputes. *See Buell,* 480 U.S. at 562, 107 S.Ct. 1410. To accomplish this goal, the RLA establishes a mandatory arbitral mechanism for the " 'prompt and orderly settlement' " of two classes of disputes. *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (quoting 45 U.S.C. § 151a). The first category, referred to as "major disputes," relate to " 'the formation of collective [bargaining] agreements or efforts to secure them.' " *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n.,* 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (*Conrail*) (quoting *Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)). Major disputes are not at issue in this case. The second category, referred to as "minor disputes," "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a. "Minor disputes involve 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.' " *Hawaiian Airlines,* 512 U.S. at 253, 114 S.Ct. 2239 (quoting Brotherhood of R.R. *Trainmen v. Chicago R. & I. Ry. Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)). "The distinguishing feature of [a minor dispute] is that the dispute may be conclusively

resolved by interpreting the existing [CBA]." *Conrail,* 491 U.S. at 305, 109 S.Ct. 2477.

█ Norfolk Southern contends that Horton's Title VII claim is a minor dispute because it requires the court to interpret the letter agreement modification to the CBA in order to determine whether Horton was qualified to receive the Productivity Fund Buyout, an essential element of his *prima facie* case under the *McDonnell Douglas* framework. Norfolk Southern argues that the RLA therefore precludes Horton from bringing his Title VII in federal court. The court disagrees.

█ The situation in this case is closely analogous to the circumstances present in *Felt.* In *Felt,* the plaintiff, a railroad employee, brought a Title VII action alleging religious discrimination. 60 F.3d at 1418. Similar to Norfolk Southern here, the defendant railroad argued that, because the CBA provided for arbitration of claims of religious discrimination and because the plaintiff sought only contractually guaranteed benefits and remedies thereby necessitating reference to and interpretation of the CBA, the Title VII claim was minor. The court in *Felt* disagreed, noting that the Supreme Court in *Hawaiian Airlines*

> explained in more specific terms that a minor dispute cannot involve rights that emanate from sources outside the [CBA]. 'Obviously, to say that a minor dispute can be "conclusively resolved" by interpreting the [CBA] is another way of saying that the dispute does not involve rights that exist independent of the [CBA].

*Id.* at 1419 (quoting *Hawaiian Airlines,* 512 U.S. at 265, 114 S.Ct. 2239). Like the plaintiff in *Felt,* Horton is asserting Title VII rights which exist independent of the CBA. *Id.* at 1420. Thus, while the RLA may provide a mechanism for resolving a claim of racial discrimination, it does not preclude litigation of Title VII rights. *See id.; cf. Buell,* 480 U.S. at 564–65, 107 S.Ct. 1410 (holding in the only Supreme

Court case to specifically address RLA preclusion that the RLA did not preclude a suit under FELA for workplace injury even though the injury was caused by conduct that may have been subject to arbitration under the RLA); *Bates v. Long Island R.R.,* 997 F.2d 1028, 1030 (2d Cir.) (holding that the arbitration procedures prescribed under the RLA are not appellants' sole forms for resolution of their claims under the Federal Rehabilitation Act, 29 U.S.C. § 794), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993).

The court's conclusion that the RLA does not preclude Horton's suit under Title VII is supported further by the Supreme Court's recent decision in *Wright v. Universal Maritime Serv. Corp.,* 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), and the Fourth Circuit's decision in *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.1996). In *Wright,* the Supreme Court addressed the issue of whether a general arbitration clause in a CBA requires an employee to use the arbitration procedure for an alleged violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* This issue implicated two lines of Supreme Court precedent in potential conflict:

> The first is represented by *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which held that an employee does not forfeit his right to a judicial forum for claimed discriminatory discharge in violation of Title VII ... if 'he first pursues his grievance to final arbitration under the nondiscrimination clause of a[CBA].' 415 U.S. at 49, 94 S.Ct. 1011. In rejecting the argument that the doctrine of election of remedies barred the Title VII lawsuit, we reasoned that a grievance is designed to vindicate a 'contractual right' under a CBA, while a lawsuit under Title VII asserts 'independent statutory rights accorded by Congress.' *Id.* at 49–50, 94 S.Ct. 1011. The statutory cause of action was not waived by the

union's agreement to the arbitration provision of the CBA, since 'there can be no prospective waiver of an employee's rights under Title VII.' *Id.* at 51, 94 S.Ct. 1011. We have followed the holding of *Gardner–Denver* in deciding the effect of CBA arbitration upon employee claims under other statutes. *See McDonald v. West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (claim under 42 U.S.C. § 1983); *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (claim under Fair Labor Standards Act, 21 U.S.C. § 201 *et seq.*).

The second line of cases implicated here is represented by *Gilmer v. Interstate/Johnson Lane Corp.*, [500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) ], which held that a claim brought under the Age Discrimination in Employment Act of 1967 (ADEA), [29 U.S.C. § 621 *et seq.*], could be subject to compulsory arbitration pursuant to an arbitration provision in a securities registration form. Relying upon the federal policy favoring arbitration embodied in the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, we said that 'statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA.' 500 U.S. at 26, 111 S.Ct. 1647 [citations omitted].

*Id.*, 119 S.Ct. at 394–95.

In *Wright*, the employee urged the court to reconcile the *Gardner–Denver* and *Gilmer* lines of cases by holding that federal forum rights cannot be waived in union-negotiated CBA's even if they can be waived in individually executed contracts, as occurred in *Gilmer*. On the other side, the employer argued that *Gilmer* represented the "radical change" in the Court's receptivity to arbitration in the two decades that have passed since *Gardner–Denver* and that *Gilmer* had sufficiently undermined *Gardner–Denver* to the extent that a union can waive employees' rights to a judicial forum. *Wright*, 119 S.Ct. at 395.

The Supreme Court, however, declined to address whether union-negotiated waivers would be enforceable because it found no such waiver had occurred in the CBA before it. In so holding, the Court found that an employee's statutory claim was not subject to a presumption of arbitrability because it did not arise out of the CBA. *Id.* at 396. In addition, the court held that, at a minimum, any union-negotiated waiver of employees' statutory right to a judicial forum for claims of employment discrimination must be clear and unmistakable. *Id.* The Court explained,

> Although it is not a substantive right ... and whether or not *Gardner–Denver*'s seemingly absolute prohibition on union waiver of employees' federal forum rights survives *Gilmer*, *Gardner–Denver* at least stands for the proposition that the right to a federal judicial forum is of sufficient importance to be protected against a less-than-explicit union waiver in a CBA.

*Id.* Thus, while an arbitration clause applying to "any dispute, claim or controversy" embraces federal statutory claims in situations involving an individual's waiver of his own rights, such language would not be sufficient to satisfy the clear and unmistakable standard applicable to a union negotiated waiver. *Id.* Finding that the CBA before it did not contain a clear and unmistakable waiver, the Court vacated the judgment of the circuit court and remanded the case for further proceedings. *Id.* at 397.

Unlike the collective bargaining agreement at issue in *Wright*, the CBA at issue in the Fourth Circuit's decision in *Austin* specifically provided for obligatory, final and binding arbitration of discrimination claims. Relying on the *Gilmer* line of cases, the Fourth Circuit concluded that the employee's federal statutory claims were subject to compulsory arbitration. *Austin*, 78 F.3d at 885. Reading the Supreme Court's decision in *Wright* together with the Fourth Circuit's decision in *Austin*, it seems clear that an employee's fed-

eral statutory rights to a judicial forum arise out of those respective statutes and are independent of any right conferred under a CBA. Thus, claims brought pursuant to these statutes are not minor disputes subject to the exclusive arbitral mechanism provided for in the RLA. Such claims may, however, be made subject to binding arbitration under the RLA where the CBA includes a clear and unmistakable ·waiver of employees' rights to a federal judicial forum for those claims. In this case, Norfolk Southern has presented no evidence of such a clear and unmistakable waiver. In the absence of such evidence, the court concludes that the RLA does not preclude Horton from bringing his Title VII claim in federal court. Accordingly, the court concludes that it does have subject matter jurisdiction over Horton's Title VII claim.

B. *Whether Horton is Entitled to De Novo Review of his Title VII Claim*

■ Next, Norfolk Southern argues that Horton cannot relitigate the findings of the PLB. In particular, Norfolk Southern contends that the PLB's determination that Horton was not in active service under the terms of the letter agreement collaterally estops him from pursuing his Title VII claim because one of the elements of his *prima facie* case is whether he was eligible for the Productivity Fund Buyout. Again, the court disagrees.

It is generally correct that under the RLA a termination by the NRAB or a PLB is "final and binding" on the parties to the dispute. 45 U.S.C. § 153 First (m). Thus, the Supreme Court has emphasized that determinations of the NRAB or a PLB are not subject to relitigation in the courts. *See Union Pac. R. Co. v. Price,* 360 U.S. 601, 608, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959) ("the plain language of [45 U.S.C. § 153 First (m) ], on its face, imports that Congress intended that the Board's disposition of a grievance should preclude a subsequent court action by a losing party").

In *Gardner–Denver,* however, the Supreme Court specifically held that a plaintiff who had fully pursued his remedy under the grievance-arbitration clause of a collective bargaining agreement should also be allowed to fully pursue his remedies under Title VII in federal court. Thus, the Court held that "[t]he federal court should consider the employee's claim *de novo.*" 415 U.S. at 60, 94 S.Ct. 1011. Accordingly, while this court may admit the arbitral decision as evidence and accord it such weight as is deemed appropriate, *id.,* the PLB's decision does not preclude Horton from receiving a *de novo* review of his Title VII claim in this court.

C. *Whether Horton's Title VII Claim is Barred by the Resignation and Release*

Norfolk Southern's final threshold argument is that the resignation and release executed by Horton bars his claim under Title VII. The court agrees.

As described above, in addition to applying for the Productivity Fund Buyout, Horton also applied for NSRC's voluntary separation program. Employees were notified of this program by a letter dated May 27, 1993. The letter included a copy of the release for the employees to review and the materials indicated that execution of the release was a condition of receiving the $110,000.00 separation payment. (*See* Horton Dep., Ex. 9.)

After Horton's application was accepted on July 22, 1993, D.G. Rush wrote Horton a letter informing him that he would receive the $110,000.00 upon "execution of the enclosed resignation and release form." (Horton Dep., Ex. 11.) Rush's letter also informed Horton of the medical benefits that the NSRC believed Horton was entitled to in addition to the $110,000.00, and stated, "[I]f you believe that you are entitled under the terms of the program to benefits other than as described in this letter and in the resignation and release form, you should notify your supervisor or

my office so that any necessary corrections may be made...." *Id.* At the time Horton received this letter, he had already applied for the Productivity Fund Buyout and knew that his first payment of $30,000.00 was due to be made in July. Despite this fact, Horton did not notify Rush to discuss whether he was entitled to the Productivity Fund Buyout. (*See* Horton Dep. at 56, 58, Ex. 8.)

On August 2, 1993, without having raised the issue of the Productivity Fund Buyout, Horton executed the release in exchange for a check in the amount of $110,000.00. The release provided in pertinent part:

> ... I, E. Horton, Jr., ... hereby release and forever discharge the Company and its agents, officers and employees from any claim (with the exception of vested pension rights), demand, action or cause of action of any kind whatsoever, known or unknown, which I have or could have on account of or in any manner arising out of or connected with my employment by the said Company, or the termination thereof, including but not limited to any claim or right asserted under or arising out of any agreement, regulation, condition or statute affording me employment protection, protecting me from employment discrimination, or covering the conditions of my employment.

> I understand that I will be eligible for continued medical coverage through CO-BRA paid by the Company for a period of up to 18 months.
> THIS RESIGNATION AND RELEASE AND THE DEDUCTIONS AUTHORIZED HEREIN ARE FULLY UNDERSTOOD BY ME. THIS DOCUMENT IS EXECUTED VOLUNTARILY AND SOLELY FOR THE CONSIDERATION ABOVE EXPRESSED WITHOUT ANY OTHER REPRESENTATION, PROMISE OR AGREEMENT OF ANY KIND WHATSOEVER HAVING BEEN MADE OR OFFERED TO ME BY THE COMPANY OR ANY AGENT, OFFICER, EMPLOYEE OR REPRESENTATIVE OF SAID COMPANY.

(Horton Dep., Ex. 12.) The parties agree that this release encompasses Horton's Title VII claim. The only issue, therefore, is whether the release is enforceable.

To analyze a release of a federal discrimination claim, this court looks to the appropriate state's law regarding the validity of releases. *See O'Shea v. Commercial Credit Corp.,* 930 F.2d 358, 362 (4th Cir.1991) (superseded by statute with respect to claims under ADEA), *cert. denied,* 502 U.S. 859, 112 S.Ct. 177, 116 L.Ed.2d 139 (1991). Under North Carolina law, a release is contractual in nature and is governed by the same rules of execution, validity, and interpretation as those governing contracts. *Travis v. Knob Creek, Inc.,* 84 N.C.App. 561, 563, 353 S.E.2d 229, 230, *rev'd on other grounds,* 321 N.C. 279, 362 S.E.2d 277 (1987). A "comprehensively phrased 'general release,' in the absence of proof of a contrary intent, is usually held to discharge *all* claims ... between the parties." *Sykes v. Keiltex Indus., Inc.,* 123 N.C.App. 482, 487, 473 S.E.2d 341, 344 (1996) (emphasis in original) (quoting *McGladrey, Hendrickson & Pullen v. Syntek Fin. Corp.,* 92 N.C.App. 708, 710–11, 375 S.E.2d 689, 691 (1989)).

Horton contends that the release should be avoided under the doctrine of mutual mistake. That doctrine, however, does not protect Horton in this case. Mutual mistake has been defined as "a mistake common to all parties to a written instrument ... [which] usually relates to a mistake concerning its contents or legal effect." *M.P. Hubbard & Co. v. Horne,* 203 N.C. 205, 208, 165 S.E. 347, 349 (1932). While Horton now contends that he misunderstood the legal effect of the release, there is no evidence that NSRC was mistaken about the legal effect of the release. Indeed, the uncontroverted evidence establishes that NSRC's intent was that the release would be a general release barring

all claims by Horton relating to his employment and resignation from NSRC. (*See* O'Brien Decl. ¶ 16.) (NSRC intended release to be a general release settling all matters arising out of Horton's employment and resignation from NSRC). Having failed to produce evidence to show that NSRC intended the release to have a limited scope, it is appropriate to enter summary judgment against Horton. *See Sykes*, 123 N.C.App. at 486–87, 473 S.E.2d at 344.

### D. *Horton's Claim under Title VII*

Even if the resignation and release did not bar Horton's Title VII claim, the court finds that Horton has failed to establish a *prima facie* case under *McDonnell Douglas* and has failed to show that NSRC's proffered rationale is a pretext for unlawful discrimination.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment" because of the individual's race. 42 U.S.C. § 2000e–2(a). To establish his claim of intentional discrimination, Horton relies on the indirect burden-shifting analysis developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff meets the relatively easy burden of establishing a *prima facie* case, an inference of discrimination arises and the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory act. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. If the employer meets its burden of articulating a legitimate non-discrimina-

tory reason for the adverse action, the *McDonnell Douglas* presumption disappears. *Id.* at 255 n. 10, 101 S.Ct. 1089. The plaintiff then bears the ultimate burden of persuasion to prove that the reason articulated by the employer was not truly the reason for the adverse action and that the employer engaged in intentional discrimination against the plaintiff. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742.

Here, to establish a *prima facie* case, Horton must show: (1) he was a member of a protected class, (2) he applied for the Productivity Fund Buyout, (3) he was eligible for the Productivity Fund Buyout, and (4) he was rejected for the Productivity Fund Buyout and other similarly situated white employee received the Productivity Fund Buyout. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993); *McNairn v. Sullivan*, 929 F.2d 974, 977 (4th Cir.1991). Norfolk Southern contends that Horton has failed to establish the third and fourth elements. The court agrees.

As to the third element, it is clear that Horton was not eligible to receive the Productivity Fund Buyout. The letter agreement limits eligibility to those employees who were in active service on May 18, 1993, or who thereafter returned to active service from illness, furlough, injury, suspension or dismissal. Horton was not in active service on May 18, 1993, or on any date subsequent to May 18, 1993. Instead, Horton was a furloughed employee who occasionally worked to fill vacancies on the former C & NW line. Although Horton had the right to become an active employee by marking up on the Asheville District Extra Board, he never did so prior to voluntarily resigning from NSRC on August 2, 1993.

In addition, Horton cannot establish the fourth element without evidence that similarly situated white employees received the Productivity Fund Buyout. All of the three employees identified by Horton, C.M. Starnes, M.E. Sherrill, and B.K.

Farmer, were in active service as of May 18, 1993, and were therefore eligible to receive the Productivity Fund Buyout.

■ Moreover, assuming *arguendo* that Horton could establish his *prima facie* case, Norfolk Southern has come forward with a legitimate non-discriminatory reason for denying him the Productivity Fund Buyout. As discussed, after an investigation conducted by Superintendent Green, NSRC determined that Horton was ineligible to receive the payment under the terms of the letter agreement. Thus, the *McDonnell Douglas* presumption disappears and Horton bears the ultimate burden of establishing that this proffered reason is pretext and that intentional discrimination was the real reason for denying Horton the payment. *See Vaughan v. MetraHealth Cos., Inc.*, 145 F.3d 197, 202 (4th Cir.1998) (applying pretext-plus standard).

First, Horton has no evidence that NSRC did not act under a reasonable belief that he was not an active employee under the terms of the letter agreement. *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996); *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992) ("The question is not whether the [reasons for the decision] were right, but whether the employer's description of its reasons is honest.").

■ Second, Horton has no evidence, other than his subjective beliefs, that NSRC's actions were motivated by discriminatory intent. "Mere subjective beliefs by the plaintiff—without the backing of hard evidence—cannot prove that an action was inspired by improper motivations." *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1119 (7th Cir. 1993), *cert. denied*, 510 U.S. 1116, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994). Accordingly, even if the release did not bar Horton's Title VII claim, the court would grant Norfolk Southern's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the court will grant Defendant Norfolk Southern Corporation's motion for summary judgment.

An order directing the parties to show cause within ten (10) days from the date of entry of this order why Norfolk Southern Railway Company should not be substituted as defendant in place of Norfolk Southern Corporation and why Norfolk Southern Corporation should not be dismissed shall be entered contemporaneously herewith.