IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 24, 2008

Charles R. Fulbruge III
Clerk

No. 07-11251

BNSF RAILWAY COMPANY

Plaintiff-Appellee

v.

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before KING, DeMOSS, and PRADO, Circuit Judges.

KING, Circuit Judge:

This appeal involves a decade-long discovery dispute between BNSF Railway Company and the Brotherhood of Maintenance of Way Employees regarding disclosure obligations under the parties' collective bargaining agreement. An article in the collective bargaining agreement provided benefits to furloughed employees if their furloughs were a direct result of increased subcontracting. The Brotherhood of Maintenance of Way Employees filed claims under this article that were sent to an arbitration board. The board ordered BNSF Railway Company to produce certain information regarding its subcontracting expenses, but the parties failed to reach an agreement on the confidentiality of the materials to be produced. The board then sustained the

claims based on BNSF Railway Company's failure to turn over the information. The district court vacated the award, finding that the board acted outside the scope of its jurisdiction in directing the production of these documents. The Brotherhood of Maintenance of Way Employees appealed the district court's judgment to this court. For the following reasons, we affirm the district court's judgment insofar as it vacated the award issued by the board, we reverse the district court's judgment insofar as it failed to remand the case to the board, and we remand the case to the district court with instructions to remand to the arbitration board for further consideration consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Brotherhood of Maintenance of Way Employees ("BMWE") and BNSF Railway Company ("BNSF") are parties to a 1996 multi-employer collective bargaining agreement (the "CBA"). During negotiations of the CBA, a stalemate was reached on the issue of subcontracting, and the matter was submitted to Presidential Emergency Board No. 229 (the "PEB"). The PEB suggested a compromise that the parties adopted verbatim as Article XV of the CBA:

> The amount of subcontracting of a carrier, measured by the ratio of adjusted engineering department purchased services (such services reduced by costs not related to contracting) to the total engineering department budget for the five-year period 1992-1996, will not be increased without employee protective consequences. In the event that subcontracting increases beyond that level, any employee covered by this Agreement who is furloughed as a direct result of such increased subcontracting shall be provided New York Dock level protection.

Thus, Article XV requires a claimant to establish two elements: (1) a present subcontracting level that exceeds the base level of allowable subcontracting and (2) that his furlough was a direct result of this increased subcontracting.

Almost immediately after the CBA became effective, the parties began disputing the content and frequency of the documentation that BNSF was

required to produce in connection with Article XV. BNSF wanted to produce only its R-1 Reports, which are public records that it files annually with the Surface Transportation Board. BMWE demanded reports that were more detailed and produced on a monthly basis.[1]

In 1998, BMWE began filing grievances against BNSF under Article XV on behalf of furloughed workers. BNSF admitted that these workers had been furloughed. However, it argued that BMWE had not shown that subcontracting had increased beyond the level allowed by Article XV or that the furloughs were "a direct result of such increased subcontracting." BMWE then requested that BNSF produce more detailed information regarding both the base and current levels of subcontracting.

When BNSF refused to produce this information, the claims were sent to arbitration before the National Railroad Adjustment Board (the "NRAB"). On May 12, 2004, the NRAB issued an award directing BNSF to turn over the source documents used to compile the summary R-1 reports for 1992-1996 and provide monthly data for the post-1996 period (the "Award").[2] In reaching this conclusion, the NRAB emphasized that (i) BNSF had relied upon its records as a defense to BMWE's claim that it had increased subcontracting levels, (ii) BNSF then refused to allow BMWE to see the source documents for the summaries that BNSF had been relying upon, and (iii) BNSF then took the position that BMWE had not provided supporting evidence to substantiate its claim. Under those circumstances, the NRAB held that BNSF was obligated to allow BMWE to

---

[1] In 1997, BMWE requested data from the National Railway Labor Conference regarding BNSF. Using only the R-1 Reports, this organization calculated BNSF's base subcontracting level for 1992-1996 as 10.2%. BNSF claims that this is the correct percentage, but the NRLC's analysis is not binding upon BMWE or the NRAB.

[2] There were two awards issued on May 12, 2004. The award referred to in this opinion is award number 36983. Award number 36984 merely states that award number 36983 is controlling and the same result is required.

inspect the source documents used by BNSF in formulating the summaries that BNSF used in defending the claims. The NRAB also noted that the benefits referred to in Article XV (i.e., New York Dock benefits) are calculated in monthly increments and, therefore, BNSF's subcontracting data should be presented on a monthly basis.

The NRAB did not provide any detailed instruction on the method of disclosure, who would be allowed to access the documents, or to what extent BNSF could protect the privacy of its business records. Instead, the NRAB remanded the matter "to the parties to take action consistent with the terms of the Award." It specifically noted that it had not made any findings on whether BMWE had shown that the employees were furloughed as a direct result of the increased subcontracting. Finally, the NRAB stated that it would sustain the claims based on an adverse inference drawn against BNSF if it failed to comply with the terms of the Award.

BNSF refused to turn over the source documents without a confidentiality agreement that would prohibit BMWE from using the information for any purpose other than the prosecution of claims. BMWE would not enter into any confidentiality agreement that would make it liable for monetary damages in the event of disclosure. After the parties were unable to agree on the terms of a confidentiality agreement, BNSF sought an interpretation of the Award from the NRAB in order "to ascertain definitive limits on the types of documents that should be made available on a going forward basis" and "to reach an understanding about exactly what showing would be necessary to comply with this Award." On June 23, 2005, the NRAB issued Interpretation No. 1, which denied BNSF's request for an interpretation because BNSF had not requested an actual interpretation but rather an advisory opinion. The NRAB gave the parties sixty days to establish their own production procedures and any accompanying confidentiality agreements. If the parties were unable to reach

an agreement, the NRAB indicated that it would make a decision on whether BNSF had fulfilled its obligations under the Award and whether the claims should be sustained.

BNSF made a second request for an interpretation of the Award, asking the NRAB to determine which of the parties' competing confidentiality agreements should be signed. On December 7, 2006, the NRAB entered Interpretation No. 2, sustaining BMWE's claims based on the negative inference that "had [BNSF] produced the information sought by [BMWE], that information would have supported [BMWE's] position."[3] As was the case with the Award, there was no finding in Interpretation No. 2 on whether BMWE had shown that the employees were furloughed as a direct result of the subcontracting.

On January 5, 2007, BNSF appealed the Award to the United States District Court for the Northern District of Texas. The district court granted BNSF's motion for summary judgment and vacated the Award, holding that the NRAB failed to interpret the CBA and instead added new terms to the CBA based on its "own notions of industrial justice." BNSF Ry. Co. v. Bhd. of Maint. of Way Employees, 523 F. Supp. 2d 498, 506 (N.D. Tex. 2007) (holding that the NRAB's "discovery mandate certainly did not draw its essence from the [CBA]").

## II. DISCUSSION
### A. Standard of Review

---

[3] Interpretation No. 2 states, in relevant part:

That opportunity [to produce the source documents] was given more than two years ago and, to this day, no information has been given by [BNSF] to [BMWE]. Given [BNSF's] original position in this dispute that the claims should be denied because [BMWE] did not provide the supporting evidence for the claims and then refused [BMWE's] requests for access to that information, which was solely in control of [BNSF], it is now appropriate to draw the negative inference that had [BNSF] produced the information sought by [BMWE], that information would have supported [BMWE's] position.

"This court reviews de novo a district court's grant and denial of summary judgment." Cont'l Airlines, Inc. v. Int'l Bhd. of Teamsters, 391 F.3d 613, 616 (5th Cir. 2004). Likewise, a district court's conclusion that an award was not based on the terms of the CBA is reviewed de novo. E.I. DuPont de Nemours & Co. v. Local 900 of the Int'l Chem. Workers Union, 968 F.2d 456, 458 (5th Cir. 1992).

Under the Railway Labor Act (the "RLA"), 45 U.S.C. §§ 151-188, minor disputes involving the interpretation of terms in an existing collective bargaining agreement—such as the dispute in this case—must be resolved through binding arbitration before the NRAB or another adjustment board. See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 303-04 (1989). These arbitration remedies "were intended by Congress to be the complete and final means for settling minor disputes." Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co., 373 U.S. 33, 39 (1963) (discussing Union Pac. R.R. Co. v. Price, 360 U.S. 601, 616-17 (1959)); see also Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 94 (1978) ("Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts. The effectiveness of the Adjustment Board in fulfilling its task depends on the finality of its determinations." (citation omitted)). Accordingly, "the federal courts do not sit as super arbitration tribunals in suits brought to enforce awards of the Adjustment Board. They may not substitute their judgments for those of the Board divisions." Diamond v. Terminal Ry. Ala. State Docks, 421 F.2d 228, 233 (5th Cir. 1970); see also United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987) ("Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.").

We have described the scope of our review of NRAB awards as "among the narrowest known to the law." Diamond, 421 F.2d at 233. The findings of the NRAB are conclusive, and we review only for: (1) failure to comply with the

RLA; (2) failure to conform or confine itself to matters within its jurisdiction; and (3) fraud or corruption. 45 U.S.C. § 153(q). "Absent one of these, the award is binding upon the parties and the findings and order are conclusive in Court." E. Air Lines, Inc. v. Transp. Workers Union, 580 F.2d 169, 172 (5th Cir. 1978).[4] The NRAB's interpretation must stand unless we find it to be "wholly baseless and completely without reason." Id. (quoting Gunther v. San Diego & Ariz. E. Ry. Co., 382 U.S. 257, 261 (1965)).

### B. The NRAB ignored an element of Article XV by sustaining the claims without making a finding on whether the furloughs were a direct result of increased subcontracting.

After describing the base level of subcontracting, Article XV states that "[i]n the event that subcontracting increases beyond that level, any employee covered by this Agreement who is furloughed as a direct result of such increased subcontracting shall be provided New York Dock level protection." The plain meaning of Article XV requires a claimant to prove that the increased subcontracting was the cause of his furlough. As reflected in the district court's opinion, the Award discusses the need to make a finding on this second element:

> Specifically, we express no opinion on whether the Claimant was ". . . furloughed as a direct result of such subcontracting . . . ." Indeed, if there was no "increased subcontracting" as contemplated by Article XV, because this claim seeks protective benefits for the Claimant, then the question of whether the Claimant is entitled to those benefits is moot.

BNSF Ry., 523 F. Supp. at 501.

It follows from this quotation that if subcontracting had increased, then the NRAB would have to reach the causation element before determining whether the claims should be sustained. The Award later threatens that

---

[4] This court also recognizes a fourth, implied ground for review: whether an award violated a party's due process rights. See Mitchell v. Cont'l Airlines, Inc., 481 F.3d 225, 231 (5th Cir. 2007).

"[s]hould [BNSF] fail to make that source information available, we will sustain the claim." The NRAB did precisely that in Interpretation No. 2: it drew an adverse inference from BNSF's failure to comply with the Award and sustained the claims without making any finding as to whether the employees' furloughs were "a direct result" of the inferred increase in subcontracting.

The logic supporting the adverse inference rule is that a party fails to produce evidence in its control in order to conceal adverse facts. There is no necessary connection between the contents of the source documents (which relate only to subcontracting expenses) and the causal relationship with a claimant's furlough. See Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge, 424 F.2d 684, 694 (5th Cir. 1970) (holding that a party who benefits from an adverse inference must still establish the remaining elements of a tort claim). Thus, assuming that the NRAB was correct in drawing an adverse inference against BNSF, that inference only established that subcontracting had increased and not that the furloughs were a direct result of that increased subcontracting.

We have previously held that an arbitration panel exceeds the scope of its jurisdiction if it ignores an explicit term in a CBA. See Cont'l Airlines, 391 F.3d at 620 (noting that an interpretation which reads out a phrase from an agreement cannot be an arguable construction of the agreement). By not making any finding as to the necessary element of causation, the NRAB essentially ignored a term of the CBA. Accordingly, sustaining the claims without any finding as to the second element of Article XV was "wholly baseless and without reason" and not an interpretation of the CBA.[5] For this reason, the Award should be vacated and the claims remanded to the NRAB.

---

[5] The district court concluded that the NRAB did not have the authority to direct production of any discovery from BNSF and, therefore, it did not need to reach the NRAB's failure to make a finding as to the causation requirement. However, it did note that the NRAB "obviously did sidestep that potentially dispositive issue and [] there does not appear to be any justification for it having done so." BNSF Ry., 523 F. Supp. 2d at 508.

## C. The NRAB acted within its jurisdiction in directing BNSF to produce the source documents.

The role of the arbitrator is "confined to interpretation and application of the [CBA]; he does not sit to dispense his own brand of industrial justice." United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960). The Supreme Court has explained that:

> [T]he arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

Misco, 484 U.S. at 38;[6] see also Cont'l Airlines, 391 F.3d at 617 (noting that an award must be "grounded in the CBA"); Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co., 768 F.2d 914, 922 (7th Cir. 1985) ("The test is not error; it is ultra vires."). In drawing on the "essence" of the contract, the NRAB is not limited to interpreting the explicit language in the CBA, but can look to implied terms as well as the parties' practice, usage, and custom. Bhd. of Ry. Carmen v. Atchison, Topeka & Santa Fe Ry. Co., 894 F.2d 1463, 1468 (5th Cir. 1990) (citing Consol. Rail, 491 U.S. at 311).

In concluding that the NRAB acted outside of its jurisdiction, the district court noted that the CBA does not include any language regarding the production of data under Article XV. BNSF Ry., 523 F. Supp. 2d at 507. Because the CBA is silent on BNSF's obligation to turn over such information, the district court concluded that the NRAB added a new term to the CBA. Id. (holding that the absence of a term means that only the parties, and not the NRAB, can resolve that issue).

---

[6] Although Misco involved the Labor Management Relations Act, this court has applied its holding to awards under the RLA. See Cont'l Airlines, 391 F.3d at 617 n.3.

The district court also gave significant consideration to Norfolk & Western Railway Company v. Transportation Communications International Union, 17 F.3d 696 (4th Cir. 1994). In Norfolk & Western, the collective bargaining agreement contained a clause stating that the arbitration board "shall have authority to request the production of additional evidence from any party." Id. at 700 n.3. The arbitration board acknowledged that the power to request was not the same as the power to compel the production of documents, but concluded that it could draw an adverse inference from the carrier's failure to comply with its request. Id. at 698. Based on that adverse inference, the arbitration board sustained the union's claim.[7] Id.

The district court differentiated Norfolk & Western based on the fact that the CBA in this case did not have a clause allowing the NRAB to request the production of documents. BNSF Ry., 523 F. Supp. 2d at 507 ("The Fourth Circuit concluded that the action of the Board was within the Board's jurisdiction because of the special provision in the contract."). In other words, the district court assumed that, but for the agreement expressly granting the arbitration board the power to request documents, the board would not have been acting within its jurisdiction. Although in Part II.B supra we have agreed that the claims should not have been sustained, we disagree with the district court's interpretation of Norfolk & Western and the remainder of its analysis.

The district court too literally interprets Norfolk & Western to mean that the NRAB's power to direct the production of documents can exist only incidental to an express clause in the CBA. Its ruling is based on the premise that it was

---

[7] In Norfolk & Western, the district court concluded that the arbitration board exceeded its jurisdiction, but granted enforcement of the award based on the extremely narrow standard of review. Id. at 699. The Fourth Circuit held that the district court had too narrowly construed the standard of review to the point of eliminating any meaningful review of arbitration awards. Id. at 700. The Fourth Circuit disagreed with the district court and found that the arbitration board acted within its authority and the district court's order was affirmed despite being based on a misapplication of the standard of review. Id. at 702.

not possible for the NRAB to have been "arguably construing or applying the contract" unless there was explicit language describing either the parties' duty to produce documents or the NRAB's power to request production. This ruling does not give sufficient deference to the NRAB.

The NRAB acts within its jurisdiction so long as its decision is drawn from the "essence" of the CBA. See Misco, 484 U.S. at 38. The essence of the CBA includes not just the express language contained within the four corners of the document, but also implied terms and the parties' practice, usage, and custom. Bhd. of Ry. Carmen, 894 F.2d at 1468 (citing Consol. Rail, 491 U.S. at 311). Under the district court's analysis, the NRAB lacked authority to direct the production of documents because there was no express provision in the CBA allowing it. Were this true, Article XV would be rendered nugatory. See Reliant Energy Servs., Inc. v. Enron Can. Corp., 349 F.3d 816, 828 (5th Cir. 2003) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." (internal quotation marks omitted)). If BNSF (i) could rely on its records as a defense to BMWE's claim that it had increased subcontracting levels, (ii) refuse to allow BMWE to see the source documents for the summaries that BNSF was relying upon, (iii) take the position that BMWE had not provided evidence to support its claim, and finally (iv) assert that the NRAB could not compel production of the source documents, then BNSF would be able to defeat any Article XV claim by refusing to turn over the relevant documents which are in its sole possession. Again, that would render Article XV a dead letter.

Article XV represents a compromise in national collective bargaining negotiations. It attempted to solve the larger impasse in those negotiations regarding subcontracting, but did not address the practical disputes that would arise regarding the administration of claims. The NRAB has the duty to arbitrate claims under Article XV, but was given little guidance in the CBA on

how to do so. Considering the Delphic language in Article XV, it was reasonable for the NRAB to conclude that implicit in Article XV was a requirement that BNSF produce documentation that would enable the NRAB to assess the validity of its defense to BMWE's claim. Otherwise, BNSF would be able to stonewall its way out of any liability under Article XV. We conclude that it was within the NRAB's jurisdiction to direct BNSF to produce documentation supporting BNSF's defense that it had not increased subcontracting when that documentation was in BNSF's sole possession.[8]

The district court also expressed concern over the NRAB's use of the phrase "basic concepts of fairness" in the Award to justify why the source documents had to be produced. It equated this phrase with Misco's directive that an arbitration board not rule based on its "own notions of industrial justice." We disagree. The NRAB was not trying to enforce some abstract equitable consideration; rather, it was determined to not allow BNSF to circumvent its liability under Article XV by refusing to produce documents. The district court was equally troubled by the reference in the Award to the national implication of the NRAB's ruling on future Article XV claims and in Interpretation No. 1 to "the ramifications of what this case means to the parties and to the industry."

---

[8] In analyzing the Award, the district court failed to discuss the two different types of documents that the NRAB directed BNSF to disclose. The Award requires that BNSF produce: (1) the source documents supporting the R-1 reports used to calculate the base level of subcontracting for the 1992-1996 period and (2) monthly data for the post-1996 period. The district court did not acknowledge that the NRAB provided completely different justifications related to each type of documentation.

Our discussion focuses on the source documents because the district court never considered the post-1996 information. Regarding the post-1996 data, the NRAB concluded that BNSF needed to turn over monthly data because the New York Dock remedy that Article XV provides is calculated monthly. Thus, the NRAB was at least "arguably construing" the terms of the CBA because this justification is based on explicit language in Article XV. Additionally, as is true of the source documents, Article XV is meaningless if the NRAB is unable to determine the current level of subcontracting. Since BNSF argued that it had not increased subcontracting, it was necessary for the NRAB to have documents establishing both the base and current levels of subcontracting.

12

Because these were the first claims filed under Article XV, the NRAB was aware of the impact of its ruling on other carriers and unions. However, this concern does not appear to have invaded the Award. This passing reference to industry-wide concerns does not show that the Award was not drawn from the essence of the CBA. The NRAB was not, as the district court described, "off on a procedural tangent." BNSF Ry., 523 F. Supp. 2d at 506. The NRAB was simply trying to fulfill its function and reach the merits of BMWE's claim. In order to do this, it was necessary to compare the base and current levels of subcontracting. Therefore, it was reasonable for the NRAB to interpret the CBA as containing an implied obligation requiring BNSF to turn over the source documents after BNSF relied on its records as a defense to BMWE's claim that it had increased subcontracting levels and, at the same time, took the position that BMWE had not provided evidence to substantiate that claim.

Having determined that the Award was within the NRAB's jurisdiction, we next consider whether the NRAB erred in refusing to interpret the Award.

D. The NRAB did not violate its obligation to interpret the Award.

BNSF contends that the NRAB was statutorily obligated to provide an interpretation of the Award upon request and thereby break the parties' impasse on the confidentiality of the produced materials. Section 3 First (m) of the RLA states that "[i]n case a dispute arises involving an interpretation of the award, the division of the board upon request of either party shall interpret the award in the light of the dispute." 45 U.S.C. § 153(m) (emphasis added). This language is mandatory and not permissive. See Great N. Ry. Co. v. Nat'l R.R. Adjustment Bd., 422 F.2d 1187, 1190-91 (7th Cir. 1970) (describing a party's right to an interpretation of an NRAB award as "absolute and unequivocal" and stating that the NRAB has "no discretion or authority" to deny a request for interpretation).

BNSF made two requests for an interpretation, but we are primarily concerned with the second request.[9] In its second request for interpretation, BNSF submitted the parties' competing confidentiality agreements and asked the NRAB to determine which agreement should be signed. The NRAB did not select a confidentiality agreement, instead sustaining the claims based on BNSF's failure to turn over the source documents.

The NRAB consistently informed BNSF that it would draw an adverse inference if BNSF failed to comply with the Award. In the Award, the NRAB stated that "[s]hould the Carrier fail to make that source information available, we will sustain the claim." This warning was explicit and unequivocal. In Interpretation No. 1, the NRAB stated:

> The obligation is on [BNSF] to produce the required information. The obligation is on the parties—and not the Board—to set up procedures for the production of that information and to agree upon further procedures to protect the confidentiality of [BNSF's] records. The parties are also free through the negotiation process to come up with something completely different that will resolve these particular disputes or contracting disputes in general. Should that not be accomplished, then these disputes can return to the Board. The Board will then decide whether the requirements specified in [the Award] have been met and, if they are not met, whether to sustain the claims.

The NRAB again informed BNSF that the parties were obligated to settle any concerns over confidentiality and that it was not the role of the NRAB to assist in protecting BNSF's business records. In its second request for interpretation, BNSF did not ask the NRAB to give a detailed explanation of the phrase "source documents." Instead, it appears that BNSF understood what

---

[9] The first request for interpretation asked if BNSF's obligation would be satisfied if it provided a list of certain documents. The NRAB refused to interpret the Award because it believed that BNSF was seeking an advisory opinion rather than an actual interpretation. We do not need to decide whether this was a request for an advisory opinion or for an interpretation because the adverse inference was made in Interpretation No. 2.

would constitute source documents for the 1992-1996 period because it was prepared to turn over these documents subject to a satisfactory confidentiality agreement. At this point, the primary dispute between the parties was the content of the confidentiality agreement and whether it would include money damages as a remedy, not which documents were "source documents."

In its second request for interpretation, BNSF asserted that if it is required to turn over the source documents, then it "is entitled to require a non-disclosure agreement that will effectively protect its proprietary interest in this confidential financial information." BNSF did not give a justification or citation for this generalization. Lost in the negotiations of the specific details of a confidentiality agreement was the question of whether the NRAB had the authority to require the parties to enter such an agreement. In fact, in its second request for interpretation, BNSF questioned the NRAB's authority to craft its own version of a confidentiality agreement because the matter "is not covered by the Railway Labor Act." The NRAB may have been hesitant to select one of the confidentiality agreements, or impose its own, because it may have lacked confidence in its jurisdiction to do so. Rather, it took the measured approach of allowing the parties to negotiate a compromise. Indeed, had the NRAB chosen one confidentiality agreement over the other, it is likely that this matter would have been on appeal on that issue instead. However, since this issue is not before us, we do not need to answer the question of whether the NRAB could have imposed a confidentiality agreement on the parties.

The NRAB did not fail to interpret the Award. It explained exactly what it was going to do from the Award through Interpretation No. 2. Being bound by the CBA, the NRAB did not want to force one party into a confidentiality agreement when the parties had not previously granted the NRAB such power in the CBA. Whereas the obligation to produce documents was implicit in order for Article XV to be effectuated under the particular circumstances of this

dispute, we are not prepared to say the same about the details of a confidentiality agreement, e.g., whether a breach of the confidentiality agreement should result in damages. Accordingly, the NRAB did the most reasonable thing within its power: it directed the parties to negotiate the terms of a confidentiality agreement. When they failed to do so, the NRAB enforced the terms of the Award and drew an adverse inference against BNSF. Thus, its error was not in drawing the adverse inference—that was permissible—but rather it was in sustaining the claims based solely on that adverse inference without making a finding as to the causation element.

## III. CONCLUSION

Section 3 First (q) of the RLA allows the district court to "affirm the order of the division or to set it aside, in whole or in part, or it may remand the proceedings to the division for such further action as it may direct." 45 U.S.C. § 153(q). After vacating the Award, the district court decided not to remand the case to the NRAB because "the claimants, through [BMWE], have had a full and adequate opportunity to present their case to the [NRAB], and apparently have not presented to the [NRAB] any evidence that would allow the [NRAB] to rule that their claims have merit." BNSF Ry., 523 F. Supp. 2d at 508. However, as the district court recognized, the NRAB never considered the second element of Article XV—whether the furloughs were a direct result of increased subcontracting. Therefore, remand is appropriate to allow the NRAB to reconsider the claims in light of this opinion.

For the reasons stated above, we AFFIRM the district court's judgment insofar as it vacated the Award, we REVERSE the district court's judgment insofar as it failed to remand the case to the NRAB, and we REMAND the case to the district court with instructions to remand to the NRAB for further consideration consistent with this opinion. Each party shall bear its own costs.